# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

_____

UNION PACIFIC RAILROAD COMPANY )

Petitioner,

v.                                    )    Case No.  22-3648

SURFACE TRANSPORTATION BOARD; )
UNITED STATES OF AMERICA,

Respondents.
_____ )

## PETITION FOR REVIEW

Pursuant to 28 U.S.C. § 2321(a), 28 U.S.C. §§ 2342-2344, and Federal Rule of Appellate Procedure 15, Union Pacific Railroad Company ("Union Pacific") hereby petitions this Court for review of the Surface Transportation Board's December 19, 2022, order adopting a final rule in the Board's Docket No. EP 755, *Final Offer Rate Review* (attached hereto as Exhibit A).

Venue is proper in this Court because Union Pacific's principal office is in this Circuit. *See* 28 U.S.C. § 2343.

Union Pacific seeks relief on the grounds that the agency action is in excess of its authority; arbitrary, capricious, and an abuse of discretion under the Administrative Procedure Act; and otherwise contrary to law.

Respectfully submitted,

/s/ Michael L. Rosenthal

CRAIG V. RICHARDSON  MICHAEL L. ROSENTHAL
JAMES B. BOLES  Covington & Burling LLP
TONYA W. CONLEY  One CityCenter
Union Pacific Railroad Company  850 Tenth Street, N.W.
1400 Douglas Street  Washington, DC 20001
Omaha, NE 68179  (202) 662-6000

*Counsel for Union Pacific Railroad Company*

December 27, 2022

2

# CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of December, 2022, I electronically filed the foregoing, together with a copy of the agency action at issue, with the Clerk of the Court for the United States Court of Appeals for the Eight Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, together with a copy of the agency action at issue, to the following non-CM/ECF participants:

Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-00001

General Counsel
Office of the General Counsel
Surface Transportation Board
395 E. Street, S.W.
Washington, DC 20423

/s/ Michael L. Rosenthal
MICHAEL L. ROSENTHAL
Covington & Burling LLP
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
(202) 662-6000

**EXHIBIT A**

SERVICE DATE – DECEMBER 19, 2022

SURFACE TRANSPORTATION BOARD

DECISION

Docket No. EP 755

FINAL OFFER RATE REVIEW

Docket No. EP 665 (Sub-No. 2)[1]

EXPANDING ACCESS TO RATE RELIEF

Decided:  December 19, 2022

AGENCY:  Surface Transportation Board.

ACTION:  Final rule; termination of proceeding.

SUMMARY:  The Surface Transportation Board (STB or Board) is adopting a final rule in Docket No. EP 755 to establish a new procedure for challenging the reasonableness of railroad rates in smaller cases.  Under this rate review procedure, the Board will decide a case by selecting either the complainant's or the defendant's final offer, subject to an expedited procedural schedule that adheres to firm deadlines.  The Board is also terminating its proceeding in Docket No. EP 665 (Sub-No. 2).

DATES:  The final rule is effective sixty days after notice of this decision is published in the Federal Register.  The termination of proceeding is effective on January 3, 2023.

FOR FURTHER INFORMATION CONTACT:  Amy Ziehm at (202) 245-0391.  Assistance for the hearing impaired is available through the Federal Relay Service at (800) 877-8339.

SUPPLEMENTARY INFORMATION:  In January 2018, the Board established its Rate Reform Task Force (RRTF), with the objectives of developing recommendations to reform and streamline the Board's rate review processes for large cases and determining how to best provide a rate review process for smaller cases.  After holding informal meetings throughout 2018, the RRTF issued a report on April 25, 2019 (RRTF Report).[2]  Among other recommendations, the RRTF included a proposal for a final offer procedure, which it described as "an administrative approach that would take advantage of procedural limitations, rather than substantive limitations,

---

[1]  These proceedings are not consolidated.  A single decision is being issued for administrative convenience.

[2]  The RRTF Report was posted on the Board's website on April 29, 2019, and can be accessed at https://www.stb.gov/stb/rail/Rate_Reform_Task_Force_Report.pdf.

Appellate Case: 22-3648     Page: 5     Date Filed: 12/27/2022 Entry ID: 5230620

to constrain the cost and complexity of a rate reasonableness case." RRTF Rep. 12. Versions of a final offer process for rate review have also been recommended by the U.S. Department of Agriculture (USDA) and a committee of the Transportation Research Board (TRB).

In a notice of proposed rulemaking issued on September 12, 2019, the Board proposed to build on the RRTF recommendation and establish a new rate case procedure for smaller cases, the Final Offer Rate Review (FORR) procedure. Final Offer Rate Rev. (NPRM), EP 755 et al. (STB served Sept. 12, 2019).[3]

The Board received numerous comments on the NPRM. By decision served on May 15, 2020, to permit informal discussions with stakeholders, the Board waived the general prohibition on ex parte communications between June 1, 2020, and July 15, 2020. Meetings took place during the specified period; parties filed memoranda pursuant to 49 C.F.R. § 1102.2(g)(4); the memoranda were posted on the Board's website; and parties were permitted to submit written comments in response to the memoranda.

On November 15, 2021, the Board issued a supplemental notice of proposed rulemaking, which made minor changes to the proposal in the NPRM. Final Offer Rate Rev. (SNPRM), EP 755 et al. (STB served Nov. 15, 2021).[4] The Board issued the SNPRM "so that the modified FORR proposal may be considered in parallel with the proposal in Docket No. EP 765 to establish an arbitration program that could include an exemption from FORR for carriers that participate in the program." SNPRM, EP 755 et al., slip op. at 9. The Board received several comments and reply comments on the SNPRM.[5]

After considering the comments filed in response to the NPRM and SNPRM and information received in meetings with stakeholders, the Board will adopt its proposal in Docket No. EP 755 as modified in the SNPRM. The Board will also terminate the proceeding in Docket No. EP 665 (Sub-No. 2).

To the extent the discussion below does not revisit issues raised in comments on the NPRM, the SNPRM contains the Board's analysis of those issues.

---

[3] The NPRM was published in the Federal Register, 84 Fed. Reg. 48,872 (Sept. 17, 2019).

[4] The SNPRM was published in the Federal Register, 86 Fed. Reg. 67,622 (Nov. 26, 2021).

[5] The following parties submitted comments on the SNPRM: the American Chemistry Council, The Fertilizer Institute, the National Industrial Transportation League, the Chlorine Institute, and the Corn Refiners Association (collectively, the Coalition Associations); the American Fuel & Petrochemical Manufacturers (AFPM); the Association of American Railroads (AAR); BNSF Railway Company (BNSF); Indorama Ventures (Indorama); Industrial Minerals Association – North America (IMA-NA); National Grain and Feed Association (NGFA); Olin Corporation (Olin); Union Pacific Railroad Company (UP); and USDA.

Appellate Case: 22-3648     Page: 6     Date Filed: 12/27/2022 Entry ID: 5230620

BACKGROUND

In the ICC Termination Act of 1995 (ICCTA), Congress directed the Board to "establish a simplified and expedited method for determining the reasonableness of challenged rail rates in those cases in which a full stand-alone cost [(SAC)] presentation is too costly, given the value of the case." Pub. L. No. 104-88, 109 Stat. 803, 810. In the Surface Transportation Board Reauthorization Act of 2015 (STB Reauthorization Act), Pub. L. No. 114-110, 129 Stat. 2228, Congress revised the text of this requirement so that it currently reads: "[t]he Board shall maintain *1 or more* simplified and expedited methods for determining the reasonableness of challenged rates in those cases in which a full [SAC] presentation is too costly, given the value of the case." 49 U.S.C. § 10701(d)(3) (emphasis added). In addition, section 11 of the STB Reauthorization Act modified 49 U.S.C. § 10704(d) to require that the Board "maintain procedures to ensure the expeditious handling of challenges to the reasonableness of railroad rates."[6] More generally, the rail transportation policy (RTP) at 49 U.S.C. § 10101 states that, in regulating the railroad industry, it is the policy of the United States Government to, among other things, "provide for the expeditious handling and resolution of all proceedings required or permitted to be brought under this part." 49 U.S.C. § 10101(15).

In 1996, the Board adopted a simplified methodology, known as Three-Benchmark, which determines the reasonableness of a challenged rate using three benchmark figures. Rate Guidelines—Non-Coal Proc., 1 S.T.B. 1004 (1996), pet. to reopen denied, 2 S.T.B. 619 (1997), appeal dismissed sub nom. Ass'n of Am. R.Rs. v. STB, 146 F.3d 942 (D.C. Cir. 1998). A decade passed without any complainant bringing a case under that methodology. In 2007, the Board modified the Three-Benchmark methodology and also created another simplified methodology, known as Simplified-SAC, which determines whether a captive shipper is being forced to cross-subsidize other parts of the railroad's network. See Simplified Standards for Rail Rate Cases, EP 646 (Sub-No. 1) (STB served Sept. 5, 2007), aff'd sub nom. CSX Transp., Inc. v. STB, 568 F.3d 236 (D.C. Cir. 2009), vacated in part on reh'g, 584 F.3d 1076 (D.C. Cir. 2009). In 2013, the Board increased the relief available under the Three-Benchmark methodology and removed the relief limit on the Simplified-SAC methodology, among other things. See Rate Regul. Reforms, EP 715 (STB served July 18, 2013), remanded in part sub nom. CSX Transp., Inc. v. STB, 754 F.3d 1056 (D.C. Cir. 2014). Notwithstanding the Board's efforts to improve its rate review methodologies and make them more accessible, only a few Three-Benchmark cases have ever been brought to the Board, and no complaint has been litigated to completion under the Simplified-SAC methodology.

The Board has recognized that, for smaller disputes, the litigation costs required to bring a case under the Board's existing rate reasonableness methodologies can quickly exceed the value of the case. Expanding Access to Rate Relief, EP 665 (Sub-No. 2), slip op. at 10 (STB served Aug. 31, 2016). As the Board stated in Simplified Standards, "[f]or some shippers who have smaller disputes with a carrier, even [Simplified-SAC] would be too expensive, given the

---

[6] Prior to the enactment of the STB Reauthorization Act, § 10704(d) began with a sentence stating that, "[w]ithin 9 months after January 1, 1996, the Board shall establish procedures to ensure expeditious handling of challenges to the reasonableness of railroad rates." See, e.g., 49 U.S.C. § 10704(d) (2014).

Appellate Case: 22-3648    Page: 7    Date Filed: 12/27/2022 Entry ID: 5230620

smaller value of their cases.  These shippers must also have an avenue to pursue relief." Simplified Standards, EP 646 (Sub-No. 1), slip op. at 16.  Along similar lines, as the Board has previously stated, simplified procedures "enable the affected shippers to avail themselves of their statutory right to challenge rates charged on captive rail traffic regardless of the size of the complaint."  Non-Coal Proc., 1 S.T.B. at 1057.[7]

In public comments, shippers and other interested parties have repeatedly stated that the Board's current options for challenging the reasonableness of rates do not meet their need for expeditious resolution of disputes at a reasonable cost.[8]  Moreover, because a contract rate may not be challenged before the Board, 49 U.S.C. § 10709(c)(1), a party to a contract that is seeking a lower rate may shift from contract rates to tariff rates before bringing a rate case, and tariff rates may be higher than prior contract rates.[9]  That factor gives complainants a strong interest in having a rate case decided quickly, from start to finish.

---

[7]  See also Calculation of Variable Costs in Rate Compl. Proc. Involving Non-Class I R.Rs., 6 S.T.B. 798, 803 & n.19 (2003) ("[W]e have adopted simplified evidentiary procedures for adjudicating rate reasonableness in those cases where more sophisticated procedures are too costly or burdensome, 'to ensure that no shipper is foreclosed from exercising its statutory right to challenge the reasonableness of rates charged on its captive traffic.'" (quoting Non-Coal Proc., 1 S.T.B. at 1008)); Mkt. Dominance Determinations—Prod. & Geographic Competition, 3 S.T.B. 937, 949 (1998) (excluding product and geographic competition from consideration in market dominance determinations so as to "remove a substantial obstacle to the shippers' ability to exercise their statutory rights").

[8]  See, e.g., Alliance for Rail Competition Opening Comment 22, June 26, 2014, Rail Transp. of Grain, Rate Regul. Rev., EP 665 (Sub-No. 1) (stating that the Three-Benchmark methodology is too costly and complex for grain shippers and producers in its current form); WCTL Opening Comment 74-76, Oct. 23, 2012, Rate Regulation Reforms, EP 715 (the cost and complexity of the Simplified-SAC methodology discourage its use); Oversight of the STB Reauthorization Act of 2015 Before the Subcomm. on R.Rs., Pipelines, & Hazardous Materials of the H. Comm. on Transp. & Infrastructure, 115th Cong. (2018) (letter from Chris Jahn, then-President of The Fertilizer Institute, submitted for the record) (due to the time and expense needed to pursue a rate case, it "does not work" for most complainants).

[9]  As an example, a recent rate proceeding involved a complainant that had been served pursuant to contracts for many years and then filed its complaint as soon as its contract expired. See Consumers Energy Co. Compl. 4-5, Jan. 13, 2015, Consumers Energy Co. v. CSX Transp., Inc., NOR 42142; see also Occidental Chem. Corp. Comments 2-4, Oct. 23, 2012, Rate Regul. Reforms, EP 715 (paying the tariff rate for extended periods of time while a rate case is litigated—which can add millions of dollars in costs beyond the direct costs of litigation— undermines the utility of a rate challenge, especially if the carrier requires that all rates bundled with the challenged rate also shift to tariff during the pendency of the case); PPG Indus., Inc. Comments 3-4, Oct. 23, 2012, Rate Regul. Reforms, EP 715 (noting the effect of bundling and stating that tariff premium could reach $20 million per year of rate litigation).  The latter two filings are cited here simply to illustrate the need for expedited rate reasonableness procedures,

Accordingly, the Board has continued to explore ideas to improve the accessibility of rate relief. For example, in Expanding Access to Rate Relief, Docket No. EP 665 (Sub-No. 2), the Board sought comment on procedures relying on comparison groups that could comprise a new rate reasonableness methodology for use in very small disputes. The initial comments on that proposal were universally negative. But among the comments submitted in Docket No. EP 665 (Sub-No. 2), the Board received a suggestion from USDA that the Board consider procedural limitations to streamline and expedite its rate reasonableness review as an alternative to substantive limitations. See USDA Reply Comment 5-6, Dec. 19, 2016, Expanding Access to Rate Relief, EP 665 (Sub-No. 2). USDA specifically recommended a short procedural timeline as a means to make rate reasonableness review accessible for smaller disputes. See id. To implement this recommendation, USDA suggested that the Board adopt a final offer procedure whereby parties would submit market dominance and rate reasonableness evidence in a single package offer. See id. at 6-7.

The Board already uses a final offer procedure as part of the Three-Benchmark methodology, although it is only one part of the rate reasonableness approach as opposed to providing the overall framework, as the Board is adopting here.[10] One of the benchmarks compares the markup paid by the challenged traffic to the average markup assessed on similar traffic. See, e.g., Rate Regul. Reforms, EP 715, slip op. at 11. To improve the efficiency of this part of the Three-Benchmark methodology and "enable a prompt, expedited resolution of the comparison group selection," the Board requires each party to submit its final offer comparison group simultaneously, and the Board chooses one of those groups without modification. See Simplified Standards, EP 646 (Sub-No. 1), slip op. at 18.

Although the Board may not require arbitration of rate disputes under current law,[11] and is not doing so here, the benefits of *final offer* procedures used in other settings offer support and background for the Board's rule adopted here. For example, final offer procedures are used in

---

not to indicate that the Board takes any position in this proceeding—one way or another—on the appropriateness of rate bundling.

[10] The Three-Benchmark methodology also includes more procedural steps and a longer timeline than the FORR procedure adopted here. See 49 C.F.R. § 1111.10(a)(2).

[11] See Arb.—Various Matters, EP 586, slip op. at 3 n.7 (STB served Sept. 20, 2001); see also 49 U.S.C. § 10704(a)(1); 49 U.S.C. § 11704(c)(2). The Board has had a *voluntary* arbitration process in place for more than 20 years, and section 13 of the STB Reauthorization Act required adjustments to this process (including the addition of rate disputes to the types of matters eligible for arbitration), but to date parties have not agreed to arbitration of any dispute brought before the Board. See Arb. of Certain Disps., 2 S.T.B. 564 (1997) (adopting voluntary arbitration procedures at 49 C.F.R. part 1108); Revisions to Arb. Proc., EP 730 (STB served Sept. 30, 2016) (making adjustments required by STB Reauthorization Act); Joint Pet. for Rulemaking to Establish a Voluntary Arb. Program for Small Rate Disps. (Arbitration NPRM), EP 765, slip op. at 2-3 (STB served Nov. 15, 2021) (describing the Board's voluntary arbitration programs). In addition to its recommendation for a final offer procedure that would culminate in a decision by the Board, the RRTF recommended legislation that would permit mandatory arbitration of small rate cases. See RRTF Rep. 14-15.

Appellate Case: 22-3648     Page: 9     Date Filed: 12/27/2022 Entry ID: 5230620

commercial settings, including the resolution of wage disputes in Major League Baseball, and final offer arbitration is therefore sometimes referred to as "baseball arbitration." See, e.g., Josh Chetwynd, Play Ball? An Analysis of Final-Offer Arb., Its Use in Major League Baseball, & Its Potential Applicability to Eur. Football Wage & Transfer Disps., 20 Marq. Sports L. Rev. 109 (2009) (noting the final offer procedure "can lead to a win-win situation as it spurs negotiated settlement at a very high rate"); see also Michael Carrell & Richard Bales, Considering Final Offer Arb. to Resolve Pub. Sector Impasses in Times of Concession Bargaining, 28 Ohio St. J. on Disp. Resol. 1, 3, 16, 23-24 (2012) (noting that 14 states had codified some form of final offer arbitration for certain labor disputes involving public sector employees and noting that the procedure "encourages the parties to negotiate toward middle ground rather than staking out polar positions" and "encourages the parties to settle before arbitration").

Similarly, AAR itself provides its members a final offer procedure for car hire arbitration. See Circular No. OT-10, Code of Car Hire Rule 25, https://www.railinc.com/rportal/documents/18/260773/OT-10.pdf. The Board described that final offer procedure as "integral" to its decision to deregulate car hire rates. See Joint Pet. for Rulemaking on R.R. Car Hire Comp., EP 334 (Sub-No. 8) et al., slip op. at 1 (STB served Apr. 22, 1997).

Finally in this regard, the Committee for a Study of Freight Rail Transportation and Regulation of the Transportation Research Board (TRB Committee) described the benefits of adopting "an independent arbitration process similar to the one long used for resolving rate disputes in Canada." Nat'l Acads. of Sciences, Eng'g, & Med., Modernizing Freight Rail Regul. (TRB Report) (2015), at 7, 136-40, http://nap.edu/21759.[12]  In particular, the TRB Committee recommended "a final-offer rule," set on a "strict time limit," whereby "each side offers its evidence, arguments, and possibly a changed rate or other remedy in a complete and unmodifiable form after a brief hearing." TRB Rep. 211-12. According to the TRB Report,

---

[12]  In the process used by Canadian regulators, final offer procedures are administered by an outside arbitrator or panel of arbitrators. In Canada, a complainant may submit its rate dispute to the Canadian Transportation Agency, which refers the matter to an arbitrator or a panel of arbitrators. Canada Transp. Act, S.C. 1996, c. 10, as amended, §§ 161(1), 162(1) (Can.). The Canadian statute establishes a two-tiered structure: if the matter involves freight charges of more than $2 million CAD (subject to an inflation adjustment), a 60-day procedure applies, and if the matter involves freight charges of $2 million CAD or less (subject to an inflation adjustment), a 30-day procedure applies. Id. §§ 164.1, 165(2)(b). Among other things, the 60-day procedure allows the parties to direct interrogatories to one another, and the arbitrator may request written filings beyond the final offers and information initially submitted in support of final offers. See id. §§ 163(4), 164(1). In the 30-day procedure, there is no discovery, and the arbitrator may request oral presentations from the parties but may not request written submissions beyond the final offers and replies. See id. § 164.1. The arbitrator's decision is issued within 60 days after the matter was submitted for arbitration, or 30 days if the further expedited procedure applies. Id. § 165(2)(b). Any resulting rate prescription is limited to two years, unless the parties agree to a different period. See id. § 165(2)(c).

Appellate Case: 22-3648     Page: 10     Date Filed: 12/27/2022 Entry ID: 5230620

adoption of such a procedure could enhance complainants' access to rate reasonableness protections, while expediting dispute resolution and encouraging settlements. Id. at 212.

The RRTF agreed that a final offer process—with the decision being made by the Board rather than an arbitrator—could be an effective way to implement procedural limitations, which would improve access to rate relief. RRTF Rep. 16.

Taking into account these recommendations, the Board's NPRM proposed to adopt a FORR process with the following primary features. As proposed, FORR would allow limited discovery, with no litigation over discovery disputes; FORR could be used only if the complainant elected to use the streamlined market dominance approach proposed (and since adopted) in Docket No. EP 756, Market Dominance Streamlined Approach;[13] and the procedural schedule would be brief, with a Board decision issued within 135 days after filing of the complaint. See NPRM, EP 755 et al., slip op. at 8-10, 13-14.

Parties would simultaneously submit their market dominance presentations, final offers, analyses addressing the reasonableness of the challenged rate and support for the rate in the party's offer, and explanations of the methodologies used and how they comply with the decisional criteria set forth in the NPRM. NPRM, EP 755 et al., slip op. at 12. Parties would next submit simultaneous replies. Id.

The complainant would bear the burden of proof to demonstrate that (i) the defendant carrier has market dominance over the transportation to which the rate applies, and (ii) the challenged rate is unreasonable. NPRM, EP 755 et al., slip op. at 12-13; see also 49 U.S.C. §§ 10701(d)(1), 10704(a)(1), 11704(b); Union Pac. R.R.—Pet. for Declaratory Ord., FD 35504, slip op. at 2 (STB served Oct. 10, 2014). If the Board were to find that the complainant's market dominance presentation and rate reasonableness analysis demonstrate that the defendant carrier has market dominance over the transportation to which the rate applies and that the challenged rate is unreasonable, the Board would then choose between the parties' final offers. In making the rate reasonableness finding and choosing between the offers, the Board would take into account the criteria specified in the NPRM: the RTP, the Long-Cannon factors in 49 U.S.C. § 10701(d)(2), and appropriate economic principles. See NPRM, EP 755 et al., slip op. at 10-13.

The Board proposed a relief cap of $4 million, indexed annually using the Producer Price Index, consistent with the potential relief afforded under the Three-Benchmark methodology. See NPRM, EP 755 et al., slip op. at 16.

The Board also sought additional comments on Docket No. EP 665 (Sub-No. 2), including whether to close that docket. NPRM, EP 755 et al., slip op. at 17.

In the SNPRM, the Board made the following changes to its FORR proposal: removing the use of adverse inferences and instead adopting a process for motions to compel discovery; including mandatory mediation in FORR cases; requiring only the complainant to submit market dominance evidence on opening; allowing complainants to choose between streamlined and non-

---

[13] Mkt. Dominance Streamlined Approach, EP 756 (STB served Aug. 3, 2020) (adopting final rule).

streamlined market dominance approaches; and extending the proposed procedural schedule to accommodate motions to compel, mandatory mediation, and (in cases where it is selected) non-streamlined market dominance. SNPRM, EP 755 et al., slip op. at 35-36, 38-42. The SNPRM also provided further information regarding FORR's decisional criteria. Id. at 26-27.

Also, on November 25, 2020, the Board instituted a rulemaking proceeding to consider a proposal by Canadian National Railway Company, CSX Transportation, Inc., The Kansas City Southern Railway Company, Norfolk Southern Railway Company, and UP to establish a new, voluntary arbitration program for small rate disputes. Joint Pet. for Rulemaking to Establish a Voluntary Arb. Program for Small Rate Disps., EP 765 (STB served Nov. 25, 2020).[14] In a decision served concurrently with the SNPRM, the Board proposed to adopt a form of such an arbitration program. See Arbitration NPRM. Concurrently with this decision, the Board is issuing a decision in that proceeding that adopts final rules implementing a new small rate case arbitration program. See Joint Pet. for Rulemaking to Establish a Voluntary Arb. Program for Small Rate Disps. (Arbitration Final Rule), EP 765 (STB served Dec. 19, 2022). As part of that program, the Board will allow carriers to be exempt from rates challenges under the FORR process if all Class I carriers join the arbitration program within the specified time period and the carriers otherwise satisfy all requirements for exemption established in the Arbitration Final Rule.

DOCKET NO. EP 755:  FINAL RULE

After considering the filed comments and information received in meetings with stakeholders, the Board will adopt the rule proposed in the SNPRM, with one change addressed below in Part III.B. In **Part I**, the Board addresses comments on the purpose of the rule. In **Part II**, the Board addresses comments regarding its authority to adopt a final offer procedure. In **Part III**, the Board addresses other arguments against the FORR procedure. In **Part IV**, the Board addresses the review criteria for FORR cases. In **Part V**, the Board addresses discovery and procedural schedule issues. In **Part VI**, the Board addresses market dominance issues. In **Part VII**, the Board addresses the relief cap. Finally, in **Part VIII**, the Board addresses other miscellaneous issues. The attached Appendix contains the text of the final rule.

PART I – PURPOSE OF THE RULE

The purpose of this rule is to satisfy the statutory requirement that, if the Board determines that a rail carrier has market dominance over the transportation to which a particular rate applies, the rate established by such carrier for such transportation must be reasonable. See 49 U.S.C. § 10701(d)(1).[15] A shipper's ability to challenge a rate subject to market dominance is

---

[14] Canadian Pacific subsequently submitted a letter stating that it "supports the effort to find a workable, reasonable, accessible arbitration program for small rate cases, and would participate in such a pilot program." CP Letter, Jan. 25, 2021, Joint Pet. for Rulemaking to Establish a Voluntary Arb. Program for Small Rate Disps., EP 765.

[15] See also 49 U.S.C. § 10701(d)(3) (requiring the Board to "maintain 1 or more simplified and expedited methods for determining the reasonableness of challenged rates in those cases in which a full stand-alone cost presentation is too costly, given the value of the case");

frustrated where the litigation costs of the Board's available processes outweigh the benefits of pursuing a case. See Non-Coal Proc., 1 S.T.B. at 1049. Furthermore, in addition to litigation costs, a shipper must also take into account the risk associated with the uncertainty of receiving relief and the time it may take to obtain a decision. Because even the Board's smaller rate processes raise complexity, cost and duration challenges, shippers facing small rate disputes continue to lack meaningful access to the Board's existing rate reasonableness procedures. NPRM, EP 755 et al., slip op. at 3. Along with the Board's arbitration procedures newly adopted in Docket No. EP 765, FORR represents one possible solution for providing cost-effective rate relief in small cases. The Board expects that FORR's procedural limitations should lower the cost of litigating rate disputes, providing complainants who otherwise might be deterred from bringing smaller rate cases under one of the Board's existing processes an additional and more accessible avenue for rate reasonableness review by the Board. NPRM, EP 755 et al., slip op. at 7. Reduced litigation costs should also make it more feasible for complainants to prove meritorious cases, while a final offer selection process would discourage extreme positions and may facilitate settlement. Id. In addition, although the Board has provided in the arbitration rulemaking that Class I carriers may be exempt from FORR procedures under certain conditions, that exemption is not guaranteed to enter into effect. See Arbitration Final Rule, EP 765, slip. op. at 7. And even if the arbitration program and FORR exemption take effect, FORR will serve as the alternative regulatory process in the event that a carrier withdraws from the arbitration program (which carriers will have the right to do if there is a change in law). Therefore, FORR remains an important long-term measure even with the potential temporary exemption established in the arbitration rulemaking.

AAR continues to question the need for a new procedure to resolve small rate disputes. (See AAR SNPRM Comment 17-18.)[16] Shipper interests uniformly indicate that there is a need for such a procedure. (AFPM SNPRM Comment 2-3; Coalition Ass'ns SNPRM Comment 1-2; IMA-NA SNPRM Comment 2-3; Indorama SNPRM Comment 2-3; NGFA SNPRM Comment 2; Olin SNPRM Comment 4-6.)

AAR argues that the Board should not "accept at face value unsupported claims from shippers that they have meritorious rate claims they have chosen not to bring." (AAR SNPRM Comment 17-18.) Therefore, according to AAR, the only relevant evidence is the absence of small rate cases, which "could be evidence that tariff-based rates are generally reasonable." (See id. at 17.)

As it did in its comments on the NPRM, AAR is again suggesting that, in order to adopt a process for determining whether or not specific rates are unreasonable, the Board must already have evidence that rates as a general matter are unreasonable. (See AAR NPRM Comment 24.) But as the SNPRM pointed out, AAR's reasoning is circular and would prevent the Board from carrying out the statutory mandate to determine the reasonableness of rates. See SNPRM,

---

49 U.S.C. § 10704(d)(1) (requiring the Board to "maintain procedures to ensure the expeditious handling of challenges to the reasonableness of railroad rates," including "appropriate measures for avoiding delay in the discovery and evidentiary phases of such proceedings").

[16] Unless otherwise specified, citations to the record are to the record in Docket No. EP 755.

EP 755 et al., slip op. at 10-11. AAR argues that the Board should disregard shippers' expressions of concern about the existing rate reasonableness processes unless an individually identified shipper presents a supported claim that it has a meritorious rate case it has chosen not to bring. (See AAR SNPRM Comment 17-18.) AAR does not attempt to explain how such a shipper would prove its rate case meritorious.

Contrary to AAR's argument, the problem addressed by this rule is illustrated by the lack of small rate cases *combined* with repeated shipper statements that they need rate relief but find the Board's existing processes too complex and expensive. NPRM, EP 755 et al., slip op. at 2-3; see also id. at 3 n.5; SNPRM, EP 755 et al., slip op. at 10. Comments from shipper interests in this proceeding bear out that problem. (See, e.g., Farmers Union NPRM Comment 5-9 (explaining the challenges faced by customers with small rate disputes, as well as citations to evidence of steadily rising rail transportation rates for agricultural commodities in recent decades);[17] NGFA NPRM Comment 5-6; USDA NPRM Comment 2-3.)

Accordingly, the Board finds that FORR will further the RTP goal of maintaining reasonable rates where there is an absence of effective competition, see § 10101(6), by providing increased access to rate reasonableness determinations in small disputes. By facilitating the determination of rate reasonableness in situations where it may not, in practice, have been feasible previously, FORR will also foster sound economic conditions in transportation. See § 10101(5). And FORR's short timelines will promote expeditious regulatory decisions and provide for the expeditious handling and resolution of proceedings. See § 10101(2), (15).

### PART II – AUTHORITY TO ADOPT A FINAL OFFER PROCEDURE

AAR renews certain of its arguments that the Board lacks statutory authority to adopt a final offer procedure under which, having found the challenged rate unreasonable, the Board must select one of the parties' offers to be the maximum rate going forward. The Board disagrees with AAR for the reasons stated in the NPRM, the SNPRM, and below.

The offer stage of FORR represents an exercise of the Board's remedial rate prescription authority: "When the Board, after a full hearing, decides that a rate" violates the statute, "the Board may prescribe the maximum rate . . . to be followed." § 10704(a)(1).

AAR asserts that a final offer procedure exceeds the scope of this clause, but that argument lacks merit. (See AAR SNPRM Comment 4-9, 11-12.) The statute authorizes the Board to "prescribe the maximum rate . . . to be followed." That is precisely what the Board would do under FORR. "Prescribe" means "[t]o dictate, ordain, or direct; to establish authoritatively (as a rule or guideline)." Black's Law Dictionary (11th ed. 2019). As long as the Board satisfies the criteria for assessing the reasonableness of rates, choosing among the parties' offers as to the maximum rate going forward is, by definition, "establishing authoritatively (as a

---

[17] Notwithstanding these widespread rate increases, no rate case addressing rail transportation of agricultural commodities has been filed with the Board or the ICC since McCarty Farms, which commenced in 1981. See McCarty Farms, Inc. v. Burlington N., Inc., 2 S.T.B. 460, 462-63 (1997) (denying rate relief after reopening and remand).

rule or guideline)" the maximum rate to be followed.  This aspect of FORR falls within
§ 10704(a)(1)'s grant of remedial authority.[18]

Implicit in AAR's argument is the incorrect premise that "prescribing" a rate under
§ 10704(a)(1) cannot occur unless the Board allows itself discretion in each case to prescribe a
rate other than one a party has proposed.  That requirement is absent from § 10704(a)(1), which
says nothing about the extent of discretion the Board can or must permit itself in prescribing a
maximum rate.  Nor has AAR identified such a requirement in any other provision, as discussed
in more detail below.  And such a requirement would contradict established Board practice.  The
Board's SAC test has long included a procedure for prescribing the maximum rate to be
followed.  This procedure, the Maximum Markup Methodology (MMM), applies mechanically,
with the Board exercising no discretion as to its application in an individual SAC case.  See
Major Issues in Rail Rate Cases, EP 657 (Sub-No. 1), slip op. at 14-15 (STB served Oct. 30,
2006), aff'd sub nom. BNSF Ry. v. STB, 526 F.3d 770, 777-81 (D.C. Cir. 2008).  At the offer
selection phase of a FORR case, by contrast, the Board would exercise discretion in selecting
between the offers.  The Board's well-established use the of MMM, therefore, contradicts AAR's
contentions that FORR is unlawful due to the supposedly insufficient discretion it affords the
Board.  (See, e.g., AAR SNPRM Comment 4-6, 7-9; see also UP SNPRM Comment 2-3.)[19]

AAR reiterates its reliance on the magistrate judge's opinion in Stone v. U.S. Forest
Serv., No. Civ. 03–586–JE, 2004 WL 1631321 (D. Or. July 16, 2004).  That decision invalidated
an agency's use of final offer procedures to determine the fair market value of a parcel of
property because, among other reasons, the governing statute "d[id] not command the agency to
select the 'better' of the two appraisals," and the fair market value might have been "somewhere
in between."  Id. at *7.

The nonbinding opinion in Stone, which cites no authority and devotes just a single
paragraph to the relevant issue, is distinguishable for several reasons.  Most importantly, the
operative statute specified a particular, highly detailed method for assessing fair market value—
one that was arguably incompatible with a final offer approach.  See 16 U.S.C. § 544g(e)(2)
(requiring "apprais[al] in conformity with the Uniform Appraisal Standards for Federal Land

---

[18]  Because the Board's authority to prescribe rates under FORR is located in
§ 10704(a)(1), AAR's contention that § 10701(d)(3) does not expand the scope of that authority
is irrelevant.  (AAR SNPRM Comment 5.)

[19]  AAR repeats its argument that "there is no basis for using [final offer procedures] with
regard to the Board's 'legislative function' of setting rates prospectively."  (AAR SNPRM
Comment 9.)  AAR states that "[t]he Board has identified no authority suggesting that final-offer
procedures can be used by agencies as a way of legislating or rulemaking."  (Id. at 10.)  In
making this argument, AAR cites a footnote in the SNPRM expressly identifying the authority
that AAR now claims has not been identified.  See SNPRM, EP 755 et al., slip op. at 16 n.30.
AAR refers to legislating or rulemaking generally, but the agency function at issue here is a
specific form of quasi-legislative authority:  the prospective setting of rates.  AAR does not deny
that §§ 10701(d)(3) and 10704 authorize the Board to develop methods for performing this
quasi-legislative function.

Acquisitions").[20]  The Board's statutes, by contrast, authorize the agency in general terms to devise methods for calculating the reasonableness of a rate and prescribing the future rate to be followed.  The governing provisions do not specify a particular method of calculation.  SNPRM, EP 755 et al., slip op. at 16 n.28; see 49 U.S.C. §§ 10701(d)(3), 10704(a)(1).  Second, the object of the Stone agency's calculations—the fair market value of an item of real estate—was a relatively objective fact that could be determined independently of the agency's analysis.  In the present context, however, there is no "maximum rate to be followed" that exists independently of a Board determination in a rate reasonableness case; although the Board must act rationally and obey its statutes and regulations in determining the maximum rate to be followed, that determination is not the kind that can be assessed for accuracy with reference to the external world.  Finally, as explained in the SNPRM, Stone also involved a second rationale:  the obvious inequities that resulted from the fact that the agency was both the adjudicator and the purchasing party.  See SNPRM, EP 755 et al., slip op. at 13-14.  That significant factor is wholly absent here.

As in its previous comments, AAR assumes that a maximum reasonable rate exists in the abstract, outside of any Board process used to determine the maximum reasonable rate.  (See AAR SNPRM Comment 8.)  Proceeding from this assumption, AAR posits a "common situation" in which this abstract ideal of a maximum reasonable rate falls between the litigants' positions.  (See id.)  Finally, based on the problem it has contrived, AAR concludes that FORR would not involve the exercise of independent judgment.  (See id. at 7-9; see also UP SNPRM Comment 2 (making similar arguments).)  As the SNPRM pointed out, however, the idea that the Board must determine the reasonableness of rail rates "in the abstract" was rejected in CSX Transportation, Inc. v. STB, 568 F.3d at 242, vacated in part on reh'g, 584 F.3d 1076 (D.C. Cir. 2009).  SNPRM, EP 755 et al., slip op. at 16.  AAR's theory seems to be that the "considerations" referenced in the statute—including revenue adequacy, the Long-Cannon factors, and the RTP—themselves dictate a particular methodology for how the prescribed maximum rate should be calculated, and in individual cases, the Board measures the challenged rate against the "maximum reasonable rate" resulting from the statute.  (See AAR SNPRM Comment 4, 8-9.)  But as noted above, the statute supplies only general goals, not methodologies (unlike, for example, the statute in Stone that required specific ways of calculating a real estate appraisal).  Instead, the ICC and the Board have developed processes that are applied in individual cases to determine a maximum rate in a manner designed to achieve those goals—as in FORR.[21]  Again, AAR identifies no statutory provision that would prevent the Board from committing in advance not to prescribe a maximum rate other than one identified by the parties.  Nor does AAR substantiate any view that such discretion is inherently necessary for an agency adjudication to be valid.

---

[20]  Available at http://www.usdoj.gov/enrd/land-ack/.

[21]  UP argues that FORR is distinguishable from the Board's existing rate reasonableness processes because those processes "were designed to implement statutory standards."  (UP SNPRM Comment 3.)  But as explained in the NPRM, the SNPRM, and this final rule, FORR is also "designed to implement statutory standards."  See, e.g., NPRM, EP 755 et al., slip op. at 10-11; SNPRM, EP 755 et al., slip op. at 12-15, 26-29.

AAR argues that because the statute does not mention the parties' pleadings among these considerations, the Board cannot adopt one party's position. (See AAR SNPRM Comment 8.) But AAR's argument leads to the absurd consequence that, in any type of adjudication where one party's position is clearly superior, the adjudicator cannot adopt that position in its entirety unless Congress has expressly identified the parties' pleadings as a source on which the adjudicator may rely.

The SNPRM pointed out similarities between FORR and the Three-Benchmark test with respect to decision-making structures and the agency's exercise of discretion. See SNPRM, EP 755 et al., slip op. at 15-16. AAR dismisses this comparison, stating that a final offer procedure is only one part of the Three-Benchmark test, whereas it provides the overall framework of FORR. (See AAR SNPRM Comment 8); SNPRM, EP 755 et al., slip op. at 5. AAR ignores the fact that, apart from evidence regarding "other relevant factors," which is optional, the Board's Three-Benchmark test comprises a final offer process and a formula—an approach in which the Board exercises its discretion in deciding between the parties' comparison groups under a final offer structure. See Union Pac. R.R. v. STB, 628 F.3d 597, 601 (D.C. Cir. 2010) ("Since the revenue need adjustment factor is derived from static figures published annually by the Board, the Three Benchmark framework's reasonableness determination generally turns on the Board's selection of a comparison group."); SNPRM, EP 755 et al., slip op. at 15.

UP similarly contends that Three-Benchmark is distinguishable from FORR in terms of the Board's exercise of discretion because parties to a Three-Benchmark case can choose to submit evidence regarding "other relevant factors." (See UP SNPRM Comment 3.) Regarding the point that "other relevant factors" evidence is optional, UP argues that that is "consistent with the function of a safety valve." (See id.) UP erroneously conflates a decision made by parties—whether to submit evidence regarding "other relevant factors" in a Three-Benchmark case—with its argument about the scope of the Board's decision-making. UP does not deny that, in any given Three-Benchmark proceeding, parties might present the Board with no "other relevant factors" evidence. In that situation, the Board's exercise of discretion in the context of that individual case is no greater than it would be in a FORR case. See Union Pac. R.R., 628 F.3d at 601.

AAR continues to argue that the Board cannot exercise its rate-prescribing power unless it performs a rate analysis distinct from any party's pleadings within each case—as opposed to exercising judgment in establishing the process itself. (See AAR SNPRM Comment 8); cf. SNPRM, EP 755 et al., slip op. at 15. But again, no such limitation is apparent in the statute or anywhere else, and AAR's arguments would also foreclose any Three-Benchmark case in which no "other relevant factors" are proposed. In such a case, the judgment in its entirety would consist of selecting a comparison group via final offer and applying the revenue need adjustment formula. The Three-Benchmark test has been affirmed on judicial review, notwithstanding the restrictive definition of agency adjudication that AAR erroneously proposes here. See CSX Transp., Inc. v. STB, 568 F.3d at 242.

Indeed, AAR's theory of adjudication, taken to its logical endpoint, would preclude the Board from having any pre-defined processes. In an individual SAC case, for example, the result produced by the SAC process and Board precedent may be above or below the abstract ideal of a

maximum rate—which AAR described in its <u>NPRM</u> comments as the rate that "best" achieves the statutory objectives. (AAR NPRM Comment 12; <u>see also</u> UP SNPRM Comment 2 (making a similar assumption that there must be an abstract "actual maximum lawful rate" that exists outside of any process used by the Board to determine the maximum reasonable rate).) But Congress expressly required the Board to create multiple rate reasonableness processes—which, by definition, could produce rates above or below AAR's hypothesized single "best" maximum rate. <u>See</u> §§ 10701(d)(3), 10704(a)(1).

According to AAR, § 10707(c) "charge(s)" the Board with determining whether a challenged rate exceeds "a reasonable maximum for that transportation." (AAR SNPRM Comment 12.) AAR argues that FORR does not permit the Board to bring its own independent judgment to bear in determining what "a reasonable maximum" rate would be and therefore conflicts with this provision. (<u>See id.</u>) This argument merely echoes AAR's other faulty arguments regarding "independent judgment" and is incorrect for the reasons stated above and in the <u>SNPRM</u>. Moreover, it is far from clear that § 10707(c) "charge(s)" the Board with anything. The statutory language partially quoted by AAR appears to delineate between the Board's determinations of market dominance and rate reasonableness, rather than establishing any directive related to rate reasonableness determinations.[22] Statutory structure supports this interpretation, as § 10707 is the provision in which Congress addressed market dominance rather than rate reasonableness. <u>See, e.g.</u>, Act of Oct. 17, 1978, Pub. L. No. 95-473, 92 Stat. 1337, 1382-83 (1978) (splitting § 10709—later renumbered as § 10707—from the statute's rate reasonableness provision and giving it the heading "Determination of market dominance in rail carrier rate proceedings"). In any event, even if § 10707(c) could be read to govern processes beyond the market-dominance determination, the statute can at most be read to bear on the Board's determination of whether a challenged rate is reasonable; the statute's text in no way limits the Board's separate authority under § 10704(a)(1) to prescribe a maximum rate to be followed.

In the <u>SNPRM</u>, the Board rejected UP's claim that FORR would limit the Board's exercise of its statutory authority. Instead, as the <u>SNPRM</u> pointed out, FORR facilitates the Board's exercise of that authority by establishing a new process for doing so, thereby providing an additional avenue for shippers with smaller rate disputes to seek relief from rates that would otherwise go unchallenged. <u>See SNPRM</u>, EP 755 et al., slip op. at 15. The <u>SNPRM</u> further pointed out that, even if the Board could be said to be using something less than its congressionally delegated authority through FORR (which it is not), the agency may choose to act within a narrower range than Congress authorized. <u>Id.</u> (citing <u>Midtec Paper Corp. v. Chi. & N.W. Transp. Co.</u>, 3 I.C.C.2d 171, 181 (1986), <u>aff'd</u> <u>sub nom.</u> <u>Midtec Paper Corp. v. United States</u>, 857 F.2d 1487, 1500 (D.C. Cir. 1988)).

---

[22] <u>See</u> § 10707(c) ("When the Board finds in any proceeding that a rail carrier proposing or defending a rate for transportation has market dominance over the transportation to which the rate applies, it may then determine that rate to be unreasonable if it exceeds a reasonable maximum for that transportation. However, a finding of market dominance does not establish a presumption that the proposed rate exceeds a reasonable maximum.").

Appellate Case: 22-3648     Page: 18     Date Filed: 12/27/2022 Entry ID: 5230620

UP now tries to distinguish <u>Midtec</u>, arguing that it involved a statute "cast in discretionary terms," <u>Midtec</u>, 857 F.2d at 1499, and did not "allow the agency to disregard a mandatory duty delegated by Congress, as the Board would be doing under FORR." (UP SNPRM Comment 2.) But on the issue of how to determine whether a rate is reasonable, it would be difficult to find a plainer example of a statute "cast in discretionary terms" than § 10701(d)(3) ("The Board shall maintain 1 or more simplified and expedited methods for determining the reasonableness of challenged rates in those cases in which a full stand-alone cost presentation is too costly, given the value of the case."); <u>see also</u> § 10704(a)(1) (providing in equally discretionary terms that, "[w]hen the Board, after a full hearing, decides that a rate charged or collected by a rail carrier for transportation subject to the jurisdiction of the Board under this part . . . does or will violate this part, the Board may prescribe the maximum rate . . . to be followed"). And UP does not even attempt to engage with the language of §§ 10701(d)(3) or 10704(a)(1) in support of its claim that, under FORR, the Board would "disregard a mandatory duty." As explained above in response to AAR, the Board would carry out its duties under § 10701(d)(3) and under the authority of § 10704(a)(1) in a FORR case.

Finally, AAR again cites <u>Morgan v. United States</u>, 304 U.S. 1, 12 (1938) for the proposition that "Congress, in requiring a 'full hearing,' had regard to judicial standards—not in any technical sense but with respect to those fundamental requirements of fairness which are of the essence of due process in a proceeding of a judicial nature." (AAR SNPRM Comment 10); <u>see also</u> § 10704(a)(1) (requiring a "full hearing" in a rate reasonableness case). According to AAR, a judge could not adopt a final offer procedure, so this quote from <u>Morgan</u> means the Board cannot either. (<u>See</u> AAR SNPRM Comment 10-11.)

Even accepting, for argument's sake, the premise that Congress lacks power to authorize federal district courts to employ a final offer process, AAR fails to acknowledge the reality that administrative agencies enjoy far greater procedural flexibility than do federal district courts. <u>SNPRM</u>, EP 755 et al., slip op. at 20; <u>see also</u> <u>Sea-Land Serv., Inc. v. United States</u>, 683 F.2d 491, 495 (D.C. Cir. 1982); <u>Pension Benefit Guaranty Corp. v. LTV Corp.</u>, 496 U.S. 633, 644 (1990); <u>R.R. Comm'n of Tex. v. United States</u>, 765 F.2d 221, 227 (D.C. Cir. 1985). AAR cannot simply assume that procedural devices unavailable in federal litigation are impermissible before agencies.

That is especially true here, where Congress expressly authorized and required the agency to develop rate reasonableness methods in open-ended terms and without any indication that these methods must be limited to those available to courts. <u>See</u> §§ 10701(d)(3), 10704(a)(1); <u>SNPRM</u>, EP 755 et al., slip op. at 20 (noting that AAR has not identified any language in these or other provisions that restricts the Board's discretion to set a rate by selecting the best of two offers after it finds the challenged rate unreasonable and considers appropriate statutory principles).[23] And in any event, as noted in the <u>SNPRM</u>, <u>Morgan</u> predates the enactment of the

---

[23] Congress, of course, knows how to invoke the procedures used in courts where it chooses to do so. <u>See, e.g.</u>, STB Reauthorization Act § 11(c) (directing the Board to "initiate a proceeding to assess procedures that are available to parties in litigation before courts to expedite such litigation and the potential application of any such procedures to rate cases"); <u>Expediting</u>

Administrative Procedure Act (APA). <u>SNPRM</u>, EP 755 et al., slip op. at 20. AAR fails to explain how its proposal to limit agency adjudicatory procedures to a far narrower band survives the APA and the cases construing it.

## PART III – OTHER ARGUMENTS AGAINST THE FORR PROCEDURE

A. <u>Burden of Proof</u>

AAR argues that, even if a FORR complainant bears the burden of proof as to market dominance and the reasonableness of the challenged rate, it is improperly relieved of the burden as to FORR's third stage, the selection of offers. (<u>See</u> AAR SNPRM Comment 12-13; AAR SNPRM Reply Comment 5.) AAR relies on 5 U.S.C. § 556(d), which establishes that, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." (<u>See</u> AAR SNPRM Comment 12-13.) Like AAR, prior Board decisions have relied on § 556(d) as the source of burden allocation in Board adjudications. <u>See, e.g.</u>, <u>NPRM</u>, EP 755 et al., slip op. at 12-13. Those Board decisions correctly assigned the burden of proof to parties seeking relief, based on Board precedent establishing such a burden allocation; that precedent will continue to apply as a general matter in Board proceedings. <u>See, e.g.</u>, <u>Union Pac. R.R.</u>, FD 35504, slip op. at 2; <u>Duke Energy Corp. v. Norfolk S. Ry.</u>, 7 S.T.B. 89, 100 (2003). On further reflection, however, the Board concludes that some of its previous decisions incorrectly identified § 556(d)—rather than Board precedent—as the source of that burden allocation. As explained in the <u>SNPRM</u>, sections 556 and 557 of the APA apply to formal "trial-type" hearings, which do not include the Board's rate reasonableness proceedings. <u>See</u> <u>SNPRM</u>, EP 755 et al., slip op. at 19-20; <u>see also, e.g.</u>, <u>R.R. Comm'n of Tex.</u>, 765 F.2d at 227 (formal adjudication procedures will "obtain only on the requirement of a 'hearing on the record'"). And precedent clearly establishes that the burden allocation language of § 556(d), in particular, does not apply outside formal "trial-type" hearings. <u>E.g.</u>, <u>Am. Trucking Ass'ns v. United States</u>, 344 U.S. 298, 318-20 (1953).

As discussed above and in the <u>SNPRM</u>, Congress has afforded agencies greater procedural leeway in cases that are not formal "trial-type" hearings. <u>See</u> <u>SNPRM</u>, EP 755 et al., slip op. at 19-20; <u>Sea-Land Serv., Inc.</u>, 683 F.2d at 495; <u>Pension Benefit Guaranty Corp.</u>, 496 U.S. at 644. Here, it is within the Board's procedural discretion to place the burden on complainants as to the portions of FORR addressing jurisdiction and culpability—that is, market dominance and the reasonableness of the challenged rate—but not as to the remedial stage of offer selection, which is equitable in nature. This allocation of burden aligns with the allocation in SAC cases, where complainants bear the burden as to market dominance and the SAC analysis, but not as to the application of the MMM (described above) to determine the maximum reasonable rate that the Board will prescribe. <u>See</u> <u>BNSF Ry.</u>, 526 F.3d at 777-81 (discussing the MMM); (Coalition Ass'ns Reply Comment 12 (analogizing similarly to the Board's other rate reasonableness procedures)). Again, AAR identifies no statutory provision that would foreclose the Board's choice to structure FORR proceedings in this way.

---

<u>Rate Cases</u>, EP 733 (STB served Nov. 30, 2017) (carrying out this direction). It did not do so in either §§ 10701(d)(3) or 10704(a)(1).

Adopting the burden allocation proposed in the NPRM and SNPRM will allow the Board to use a final offer procedure at the third stage of a FORR case, the benefits of which are described above.  See also NPRM, EP 755 et al., slip op. at 4-7 (discussing the benefits of a final offer procedure).  If complainants also bore the burden at the offer selection stage, no stage of the proceeding would contain a final offer procedure.  Cf. SNPRM, EP 755 et al., slip op. at 22-23 (recognizing that a FORR defendant could make a strategic decision to offer a rate that is lower than the challenged rate but higher than the complainant's offer; if the Board selected such an offer, the complainant would obtain rate relief despite the Board's selection of the defendant's offer).  Therefore, the benefits of a final offer procedure—particularly in light of the agency's decades-long efforts to create accessible small rate case processes, see id., slip op. at 3-5, 11—supports the burden allocation adopted here.

B.     Specific Scenarios Under FORR

AAR again describes a hypothetical scenario in which a shipper submits an offer below the jurisdictional threshold, see 49 U.S.C. § 10707(d)(1)(A), and yet the complainant otherwise proves that the defendant's offer—be it the challenged rate or otherwise—is unreasonably high.  (See AAR SNPRM Comment 11-12.)  But a FORR case would never reach that point.  If the shipper submits an offer below the jurisdictional threshold, its complaint would be dismissed due to that failure of proof.

As noted above, the SNPRM observed that a FORR defendant could make a strategic decision to offer a rate that is lower than the challenged rate but higher than the complainant's offer.  SNPRM, EP 755 et al., slip op. at 22-23; (see also UP SNPRM Comment 5 ("it is easier to defend a lower rate than a higher rate against a charge that the rate is too high")).  The SNPRM drew an analogy to a SAC case, in which a party can deliberately take a less aggressive position on an element of the analysis if it is concerned about its likelihood of success—a decision that changes what the party ultimately submits as the SAC rate.  Id., slip op. at 23 n.37.

UP asserts in response that deliberately taking a less aggressive position regarding one element of a SAC analysis is not analogous to conceding the unlawfulness of the challenged rate under FORR.  (See UP SNPRM Comment 4.)  Immediately following this assertion, however, UP makes an argument that confirms the analogy to SAC.  According to UP, because each party's final offer must reflect what it considers to be a maximum reasonable rate, "a railroad would violate FORR if it were to 'strategically' make a final offer below what it considers the lawful maximum rate."  (Id.)  But UP again fails to recognize that the maximum reasonable rate is the rate produced through the Board's rate reasonableness process, not an abstraction that exists outside such a process.  In a SAC case, a party might *believe* the correct SAC rate is higher or lower than what it chooses to submit to the Board, but it can submit a different rate nonetheless to improve its likelihood of success.  Believing in one rate and submitting another does not "violate SAC."

UP's argument appears to contemplate an intent element in rate reasonableness determinations—the idea that a railroad would "violate FORR" if it argues for one rate but has a different rate in mind.  This notion also explains UP's suggestion, (see UP SNPRM Comment 4-5), that a railroad would be *required* to advocate for prescription of a rate higher than the challenged rate, whenever it happens to believe that the rate should be higher than the

17

challenged rate.  But the Board's rate reasonableness processes do not include an intent element.  Although the <u>SNPRM</u> stated that "each party's final offer *must* reflect what it considers to be a maximum reasonable rate," <u>SNPRM</u>, EP 755 et al., slip op. at 19, the Board did not intend this statement to impose an intent requirement.  Indeed, the <u>SNPRM</u> elsewhere recognized that a carrier might choose to make a strategic decision to offer a rate lower than the challenged rate that the carrier defended in its reasonableness evidence.  <u>Id.</u> at 23 n.37.  To avoid confusion, the Board now withdraws the quoted statement of the <u>SNPRM</u>.  The Board at the offer stage will, of course, endeavor to select the offer that best accomplishes the Board's economic and statutory goals (<u>see</u> Part IV below), so parties would be wise to develop and explain their offers with those considerations in mind.  But parties are not prohibited from formulating their offers based on additional considerations, as well.

In a similar vein, the Board also clarifies that a carrier does not concede unreasonableness by submitting an offer that is lower than the challenged rate (<u>contra</u> AAR SNPRM Comment 15); the parties' offers become relevant only *after* the challenged rate has been judged unreasonable.  This means that carriers are free to argue "in the alternative" and submit separate analyses at the rate-reasonableness and offer-selection stages.  In other words, a carrier's justification supporting its choice of offer can proceed on the assumption that the challenged rate has already been found unreasonable.  Carriers are not required to submit an offer that is the same as the challenged rate and, contrary to the <u>SNPRM</u>, the Board recognizes that the two analyses may not be the same in many cases.  <u>Cf.</u> <u>SNPRM</u>, EP 755 et al., slip op. at 21.

UP also repeats its argument posing a hypothetical situation in which a complainant submits very compelling evidence that the challenged rate is unreasonable and no evidence whatsoever in support of its offer.  (<u>See</u> UP SNPRM Comment 5-6.)  In that situation, UP argues, the Board would have to accept that unsupported (and unreasonably low) offer, because the Board cannot prescribe the challenged rate after finding it unreasonable.  (<u>See</u> <u>id.</u>)  The <u>SNPRM</u> pointed out in response that it is implausible that a complainant's analysis producing an unsupported and unreasonably low rate could satisfy FORR's decisional criteria to show that the challenged rate is unreasonable.  <u>SNPRM</u>, EP 755 et al., slip op. at 23.  UP now contends that "FORR does not require the shipper's evidence of unreasonableness to show the shipper's final offer rate would be reasonable.  In fact, FORR *requires* separate analyses of the issues, see NPRM at 12 ('each party would be required to submit an analysis addressing the reasonableness of the challenged rate *and* support for the rate in the party's offer' (emphasis added)), while recognizing the evidence would 'likely' (but not necessarily) overlap, *id.* at 12 n.24."  (UP SNPRM Comment 5-6.)

UP misconstrues the language it cites from the <u>NPRM</u>.  Contrary to UP's claim, the <u>NPRM</u> does not say that FORR would require "separate analyses" of the reasonableness of the challenged rate and support for the party's offer.  However, UP is correct that FORR does not *require* a party to use the same analysis for both of these purposes.  The Board therefore clarifies that it retains the ability to prevent abuse of its processes.  If a complainant "focus[es] all its efforts" on showing that the challenged rate is unreasonable and submits no support for its offer (<u>see</u> UP NPRM Comment 15), for example, the Board could decide to dismiss the complaint without reaching the reasonableness of the challenged rate.  The Board will also confirm its ability to exercise this discretion by adding the following language to the regulations adopted

today: "If a complainant fails to submit explanation and support for its offer, the Board may dismiss the complaint without determining the reasonableness of the challenged rate."

###### C. FORR's Encouragement of Settlements

The SNPRM acknowledged that the risks faced by shippers and railroads are not reciprocal, because the Board would never prescribe a rate higher than the challenged rate. It explained, however, that this lack of reciprocity is a result of the Board's statutory mandate to regulate railroad conduct rather than shipper conduct. SNPRM, EP 755 et al., slip op. at 23-24. AAR now argues that the Board's statutory mandate does not distinguish FORR from the Board's other rate reasonableness processes, including Three-Benchmark, because they "do not suffer from the same lack of reciprocal risks and do not exert the same coercive pressure on the railroads." (See AAR SNPRM Comment 15-16.) The fact that potential carrier risk is greater than potential shipper risk in a FORR case, however, does not mean that it would be improper or unfair for the Board to adopt FORR. The statutory provisions that require railroad rates to be reasonable and authorize the Board to regulate rate reasonableness apply to all of the Board's processes. See, e.g., 49 U.S.C. § 10704(a)(1) (authorizing the Board to prescribe a rate or practice for a carrier). As the SNPRM stated, in adopting FORR, the Board has weighed the competing considerations and determined that FORR would provide sufficient benefits (see, e.g., NPRM, EP 755 et al., slip op. at 4-7) even if it were found not to afford the full settlement incentives present in certain other contexts. SNPRM, EP 755 et al., slip op. at 24.

The SNPRM stated that, while the Board would not prescribe a rate higher than the challenged rate in a FORR case, there is still considerable risk to a complainant that brings an unsuccessful FORR case that the carrier may conclude based on the Board's evaluation of the economic analyses that it has more latitude to set a higher rate. Id. The SNRPM also noted that, should the Board find the challenged rate has not been shown to be unreasonable in a given case, the Board's findings could have a preclusive effect on that complainant in subsequent litigation. Id. AAR asserts in response that "none of these risks remotely approach the severity of the risks the railroads face from an adverse outcome." (AAR SNPRM Comment 16.) But the SNPRM did not suggest that complainants' litigation risks are identical to defendants' risks, nor do they need to be. As AAR itself points out, complainants under the Board's other rate reasonableness processes do not run the risk that the Board will prescribe a rate higher than the challenged rate, because the Board is not authorized to do so. (See AAR SNPRM Comment 16.) Rather, as the SNPRM explained, bringing a FORR case is not *without* risks for complainants—and depending on the circumstances of the case, those risks could be significant, such as a railroad substantially raising the rate based on the analysis adopted in the Board's decision. See SNPRM, EP 755 et al., slip op. at 24.

The SNPRM also stated that any lack of reciprocity is balanced by the defendant carrier's possession of market dominance—a prerequisite in any rate case before the Board, including FORR. SNPRM, EP 755 et al., slip op. at 24; see also 49 U.S.C. § 10707 (market dominance prerequisite).[24] In response, UP argues that the idea of leveling the playing field does not make

---

[24] The SNPRM noted that a complainant challenging a rate that is subject to market dominance (i.e., any complainant whose case under FORR reaches the rate reasonableness

sense because (a) a market dominance finding does not mean the railroad is charging unreasonable rates, as demonstrated by the fact that railroads found to have market dominance often prevail in rate cases; and (b) the Board's market dominance test does not account for product and geographic competition, meaning that even railroads found to have market dominance "cannot charge more than market rates." (See UP SNPRM Comment 6.) But the SNPRM did not say the playing field was unlevel due to railroads' charging unreasonable rates. It referred instead to the "imbalance in bargaining power" inherent in a market dominance finding, which Congress sought to level by authorizing rate reasonableness determinations and requiring the Board maintain simplified procedures for smaller cases. SNPRM, EP 755 et al., slip op. at 24; see also 49 U.S.C. §§ 10701(d)(1), (3). As for product and geographic competition, the Board found that they effectively limit railroad pricing only "in certain circumstances," and "if there are product and geographic competitive alternatives that are *obviously* effective, a shipper would be *unlikely* to pursue a regulatory rate challenge."[25]

AAR argued in its NPRM comments—similar to its prior claims in opposing other efforts at reforming the Board's rate review processes[26]—that rates adopted through FORR settlements would become the basis for comparison groups in Three-Benchmark cases, "further driving railroad pricing down." (See AAR NPRM Comment 22-23.) The SNPRM pointed out in response that AAR's argument would apply whenever *any* shipper obtained a lower rate, either through a Board decision (using any rate reasonableness process) or a settlement. SNPRM, EP 755 et al., slip op. at 25. AAR now states that it disagrees because FORR "will create a far more severe downward force on rates." (AAR SNPRM Comment 18.)

The SNPRM's explanation to which AAR is responding dealt with a specific type of "downward force on rates"—inclusion of a rate in Three-Benchmark comparison groups. AAR's response provides no support whatsoever for the idea that FORR would lead to "ratcheting" in this way any more than lower rates obtained by any other mechanism. To the extent AAR is now abandoning its argument about FORR settlements in Three-Benchmark

---

phase) would not have the options that UP assumes would be available to complainants. (See UP NPRM Comment 14-16 (assuming, for example, that if a complainant loses, it could simply choose not to move traffic under the rate that was at issue in the case, or that, "in many situations," the challenged rate is constrained by market forces).)"

[25] See Mkt. Dominance Determinations—Prod. & Geographic Competition, 3 S.T.B. at 946 n.49, 948 (emphasis added), reconsideration denied Mkt. Dominance Determinations—Prod. & Geographic Competition, EP 627 (STB served July 2, 1999), remanded sub nom. Ass'n of Am. R.Rs. v. STB, 237 F.3d 676 (D.C. Cir. 2001), decision on remand Mkt. Dominance Determinations—Prod. & Geographic Competition, EP 627 (STB served Apr. 6, 2001), pet. for review denied sub nom. Ass'n of Am. R.Rs. v. STB, 306 F.3d 1108, 1111 & n.2 (D.C. Cir. 2002); see also Pet. of the Ass'n of Am. R.R.s, EP 717, slip op. at 7 (STB served Mar. 19, 2013) ("Indirect competition *may, in certain circumstances*, effectively constrain rail rates for transportation of coal for electric power generation.") (emphasis added).

[26] See AAR Suppl. Comment 10-11, Feb. 26, 2007, Simplified Standards for Rail Rate Cases, EP 646 (Sub-No. 1) (predicting incorrectly that the Three-Benchmark approach would "inevitably result in an overall ratcheting down of rates towards an average").

Appellate Case: 22-3648     Page: 24     Date Filed: 12/27/2022 Entry ID: 5230620

comparison groups and arguing more generally that FORR will drive down rates, it merely repeats arguments that were addressed in the SNPRM.  See SNPRM, EP 755 et al., slip op. at 23-25; (see also AAR SNPRM Comment 18 (making another, very similar contention that FORR "is unfair to railroads, creates massive uncertainty, imposes risks that are not reciprocal, and will result in prescribed rates that benefit shippers and bear no relation to market outcomes").)

Finally, BNSF repeats its assertion that uncertainty in FORR cases would deter negotiated outcomes.  (See BNSF SNPRM Comment 3.)  But as the SNPRM pointed out, SNPRM, EP 755 et al., slip op. at 23 n.38, railroad commenters offered no support for this claim, and the NPRM cited multiple sources supporting the opposite proposition.  NPRM, EP 755 et al., slip op. at 5-7.

## PART IV – REVIEW CRITERIA

As noted above, the Board stated that, in reviewing offers, it would take into account the RTP,[27] the Long-Cannon factors in 49 U.S.C. § 10701(d)(2), and appropriate economic principles.  See NPRM, EP 755 et al., slip op. at 10-13; SNPRM, EP 755 et al., slip op. at 26-29 (further explaining the criteria).  Railroad interests continue to argue that such a multi-factor test is arbitrary and capricious and unconstitutionally vague.  The Board rejects these arguments for the reasons stated in the SNPRM and below.

In the SNPRM, the Board distinguished FCC v. Fox Television Stations, Inc., 567 U.S. 239 (2012), by pointing out, among other things, that under FORR the Board would "us[e] the same statutory criteria and economic principles applied in past rate cases using other processes." SNPRM, EP 755 et al., slip op. at 29.  AAR now argues that this is not a distinguishing factor because shippers will be able to choose an economic methodology within a FORR case.  (See AAR SNPRM Comment 13-14.)

---

[27] The SNPRM explained that the Board would rely primarily on the RTP factors that have previously been relied on in the rate reasonableness context:  the policy to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail, 49 U.S.C. § 10101(1); to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Board, § 10101(3); and to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital, § 10101(6).  SNPRM, EP 755 et al., slip op. at 27. The Board emphasized that, to the extent parties seek to rely on RTP factors that have not been relied on in the rate reasonableness context, they must demonstrate how those factors relate to the economic analysis of the reasonableness of the rate.  For example, if a party wanted to argue that § 10101(4), which establishes adequacy of rail service as an RTP goal, is relevant, the party must explain the relevance of that RTP factor to the proposed methodology.  See, e.g., TRB Rep. 148 ("As common carrier rates were deregulated, so too was service quality, since a product's price and quality will be interlinked"), 201 (attention to service quality is necessary to carry out the common carrier obligation, which in turn must persist "to give effect to the law's protections for shippers from unreasonable rates").

AAR selectively quotes a phrase from the paragraph distinguishing Fox Television and ignores the analysis in the SNPRM that refutes AAR's position. As the SNPRM explained, adjudication of claims under 49 U.S.C. §§ 10702 and 11101, addressing the reasonableness of practices and the common carrier obligation, respectively, bears a close resemblance to the approach adopted here. SNPRM, EP 755 et al., slip op. at 30. Each involves a non-prescriptive, multi-factor analysis. The ICC and the Board have followed this approach for more than a century, with judicial approval, despite parties' inability to "know in advance what the Board might deem unreasonable" with the specificity that AAR would apparently require, (AAR NPRM Comment 17-18). SNPRM, EP 755 et al., slip op. at 30 (citations omitted).

In its NPRM comments, AAR characterized FORR as distinct from these other agency processes in terms of predictability, implying that the Board has given no hint as to how it would reach a decision. (See AAR NPRM Comment 17-19; AAR Comment in Response to Mem. 5, Aug. 12, 2020.) That is not so; the NPRM articulated the criteria that apply in determining rate reasonableness,[28] and if necessary, choosing an offer. These criteria would signal to parties what rates might be found unreasonable. For instance, if a defendant railroad is charging vastly more for the challenged traffic than it does for comparable traffic, if it is aware of costly inefficiencies that a new railroad would not adopt, or if its revenue from the challenged rate is out of proportion to its properly attributable capital requirements and other costs of service, (see BNSF Mem. 2 (Mtg. with Board Member Begeman)), then it could reasonably predict a lower likelihood of success in a FORR case. FORR's level of predictability, which is in line with unreasonable practice cases and other adjudications requiring the tribunal to weigh multiple factors, does not render the FORR procedure arbitrary and capricious or unconstitutionally vague. SNPRM, EP 755 et al., slip op. at 31.

In response to the SNPRM's comparison of FORR to other rate reasonableness processes in terms of predictability, AAR claims that "[i]t is no answer to say that many rate cases 'raise[ ] novel issues.'" (AAR SNPRM Comment 14.) But in fact, the SNPRM's analysis did answer a position of AAR's that it repeats in its comments on the SNPRM. According to AAR, "[u]nder FORR, it would be impossible for railroads to know in advance how to conform their conduct to the law by charging a reasonable rate." (AAR SNPRM Comment 13-14.) But, as the SNPRM pointed out, AAR's argument assumes that the Board cannot have a rate reasonableness process unless railroads can predict the outcome of that process in advance of the Board's decision in an individual case. SNPRM, EP 755 et al., slip op. at 29-30. That argument overstates the predictability of other types of litigation before the Board and understates the predictability of a

---

[28] AAR disagreed with similar reasoning proffered by Olin; AAR stated that Olin "misses the point" because, "[i]n the rate context, the elastic term 'reasonable' has specific meaning." (AAR Comment in Response to Mem. 5, Aug. 12, 2020.) In this attempt to distinguish rate reasonableness from unreasonable practice cases and rulings on the common carrier obligation, AAR did not cite any statutes or case law. See id. AAR relied instead on an article, which does not even support the point for which AAR cited it, much less provide statutory or precedential support. See id. AAR further noted that, with respect to rate reasonableness, Congress has required the Board to account for railroad revenue adequacy and the Long-Cannon factors. See id. But the FORR process does account for these considerations. See NPRM, EP 755 et al., slip op. at 10-12.

FORR case.  Notwithstanding parties' posturing in negotiations before a rate case, (see BNSF NPRM Comment 8), they cannot predict in advance the resolution of the novel, potentially case-dispositive issues that have arisen in almost every recent SAC case—nor can the Board, before the development of an administrative record.  SAC, however, is not unconstitutionally vague and has been upheld on judicial review.  SNPRM, EP 755 et al., slip op. at 30 (citations omitted).[29]

BNSF also disputes the comparison to SAC, asserting that "parties raise novel issues in SAC cases that may affect the predictability of the outcome, [but] those cases were litigated under traditional SAC procedures where the parties had the ability to fully develop the administrative record and the Board had its traditional discretion to weigh the evidence and determine what the maximum reasonable rate should be.  Neither of those procedural protections will be present in [a] FORR proceeding."  (BNSF SNPRM Comment 2.)  But BNSF does not explain how it believes the massive record development and vast range of individual issues that parties present in modern SAC cases—a process that has ballooned far beyond what SAC was meant to entail, see RRTF Rep. 22—increases parties' ability to predict the resolution of novel issues.  See SNPRM, EP 755 et al., slip op. at 29-30.

According to AAR, the Board has not provided sufficient clarity on the legal standard because it will not announce the "winning" standard until the end of a FORR case.  (See AAR SNPRM Comment 14; see also BNSF SNPRM Comment 2 (parties to a FORR case will have to litigate "without knowing what the test is until reading it in the opposing party's opening brief").)  However, AAR misstates the nature of the standard in FORR cases.  As the SNPRM explained, the legal standard in FORR cases is a non-prescriptive, multi-factor analysis, which the Board set forth in the NPRM and SNPRM.  NPRM, EP 755 et al., slip op. at 10-12; SNPRM, EP 755 et al., slip op. at 26-29.  To the extent AAR contends an agency's process is unconstitutionally vague unless the agency spells out in advance the analysis that such a test would produce in an individual case, its position runs afoul of the judicially approved legal standards applied in the Board's long-established processes for adjudicating the reasonableness of practices and railroads' adherence to the common carrier obligation.  See SNPRM, EP 755 et al., slip op. at 30.[30]

---

[29] AAR again does not address whether the discussion it cites from Paralyzed Veterans of America v. D.C. Arena, L.P., 117 F.3d 579, 584 (D.C. Cir. 1997), survives Perez v. Mortgage Bankers Association, 575 U.S. 92 (2015).  (See AAR SNPRM Comment 14.)  It does not matter here, however, for the reasons stated above.  Far from "promulgat[ing] mush," see Paralyzed Veterans, 117 F.3d at 584, the Board is adopting a test that requires the balancing of multiple factors stated in advance, as in other types of adjudication.

[30] UP argues that it is unlawful to allow a party to prevail if its submission does not reflect the statutory rate reasonableness criteria.  (See UP SNPRM Comment 3-4.)  UP is correct to the extent that a party should not be able to disregard the statutory criteria and still potentially succeed in its case.  The Board therefore clarifies that, if a party's evidence and argument addressing the reasonableness of the challenged rate do not satisfy the statutory criteria, it will not prevail on rate reasonableness.  And as noted above, the Board will endeavor at the offer selection stage to select the offer that best accomplishes the Board's economic and statutory goals.

BNSF argues that "[p]arties will face the choice of seeking to exhaustively address any potential feasible methodology that could be used to analyze the challenged rate to devise arguments in the alternative or engaging in a crash effort to adequately analyze novel methodologies in the ten days parties have to file their replies—either option leading to substantial unnecessary litigation expense." (BNSF SNPRM Comment 2.) As framed by BNSF, a party to an unreasonable practice case under § 10702 would feel the need to "address any potential feasible methodology that could be used to analyze the challenged [practice] to devise arguments in the alternative," but no one has suggested that parties litigate this way in such cases. And having to analyze the opposing party's submission quickly is a necessary part of litigating under a short timeline, which is an important aspect of improving the accessibility of the Board's rate reasonableness processes. See NPRM, EP 755 et al., slip op. at 3-4.

Similarly, AAR claims that parties to FORR cases "will not even know the materials they must produce in discovery." (AAR SNPRM Comment 14.) AAR contends that, "if a party's methodology is ultimately rejected by the Board, there is no basis for compelling their opponent to produce discovery in service of it." (Id. at 14-15.) As the Coalition Associations point out in their reply comment, however, to support the relevance of a discovery request, a party would have to be able to show how the request is relevant to the FORR criteria. (See Coalition Ass'ns SNPRM Reply Comment 14.) Also, parties are able to conduct discovery in cases addressing the reasonableness of practices and railroads' adherence to the common carrier obligation. The fact that the legal standards in these cases are non-prescriptive, multi-factor analyses has not prevented parties from "even know[ing] the materials they must produce in discovery." See, e.g., R.R. Salvage & Restoration, Inc.—Pet. for Declaratory Order, NOR 42102 (STB served July 20, 2010) (resolving a case under § 10702 following substantial discovery); Reasonableness of BNSF Ry. Coal Dust Mitigation Tariff Provisions, FD 35557 (STB served Dec. 17, 2013) (same); Bar Ale, Inc. v. Cal. N. R.R., FD 32821 (STB served July 20, 2001) (resolving a case under § 11101 following substantial discovery). A motion to compel in a case using a non-prescriptive, multi-factor analysis is not automatically defeated by the fact that the Board may "ultimately reject[]" the argument for which the discovery is sought. See, e.g., Grain Land Coop v. Canadian Pac. R.R., NOR 41687, slip op. at 2-3 (STB served Dec. 1, 1997) (compelling discovery); Sierra R.R. v. Sacramento Valley R.R., NOR 42133, slip op. at 4-5 (STB served Apr. 23, 2012) (denying a motion to compel based on the merits of that motion, without reliance on the fact that the legal standard to be applied was a non-prescriptive, multi-factor analysis).

Finally, AAR argues that "[i]f the railroad's offer is deemed 'unreasonable,' it is hard to understand how revenue adequacy would even be relevant if the Board is compelled to accept the shipper's offer." (AAR SNPRM Comment 18.) In making this argument, AAR assumes a scenario in which the Board has rejected the railroad's offer and is "compelled" to accept the shipper's offer, without any consideration of revenue adequacy. As the SNPRM explained, however, the Board would not be "compelled" to find the challenged rate unreasonable, much less reject the railroad's offer or accept the shipper's offer, in a case where the evidence does not demonstrate sufficient protection of revenue adequacy. SNPRM, EP 755 et al., slip op. at 27-28.

## PART V – DISCOVERY AND PROCEDURAL SCHEDULE

AAR repeats arguments from its NPRM comments about the brief procedural schedule having an unfairly greater impact on railroads than on shippers. (See AAR SNPRM

Comment 16-17.)  However, AAR fails to address key aspects of the SNPRM's reasoning in response to these arguments.  As the SNPRM pointed out, unlike defendants, complainants must make their cases largely based on information in the possession of the opposing party.  See SNPRM, EP 755 et al., slip op. at 37.  In this regard, shorter discovery deadlines favor the defendants and further balance out the burden that railroad interests describe.  Id.; see also Coalition Ass'ns NPRM Comment 9.  And in any event, even assuming that the procedural schedule in FORR might, in some cases, place a proportionately greater burden upon defendants than would other rate review processes, such a burden must be weighed against the likelihood that rate relief may be functionally unavailable in a small dispute.  SNPRM, EP 755 et al., slip op. at 37.

In the SNPRM, the Board revised its initial FORR proposal to add mandatory mediation. Id., slip op. at 38.  AFPM opposes this change.  (AFPM SNPRM Comment 16.)  But AFPM merely repeats NGFA's earlier argument against mandatory mediation, without addressing the Board's response to that argument.  (See id.)  As the SNPRM noted, the Board's mediation program has led to post-complaint settlements, to the benefit of the parties and the Board. SNPRM, EP 755 et al., slip op. at 38; see also, e.g., Twin City Metals, Inc. v. KET, LLC, NOR 42168 (STB served Sept. 23, 2020).  The Board concluded that mediation can produce substantial benefits and that the possibility of achieving settlement through mediation would outweigh a modest lengthening of FORR's procedural timeline.  SNPRM, EP 755 et al., slip op. at 38; see also, e.g., Assessment of Mediation & Arb. Proc., EP 699, slip op. at 2, 4 (STB served May 13, 2013) ("The Board favors the resolution of disputes through the use of mediation and arbitration procedures, in lieu of formal Board proceedings, wherever possible. . . .  If a dispute is amicably resolved, it is likely that the parties would incur considerably less time and expense than if they used the Board's formal adjudicatory process.")

The SNPRM proposed to keep the time period for the Board's decision at 90 days rather than reducing it to 60 days.  SNPRM, EP 755 et al., slip op. at 37-38.  AFPM disagrees with this determination, arguing that a 60-day comment period is the "default timeframe" to submit comments in rulemaking actions.  (AFPM SNPRM Comment 16.)  AFPM also asserts that, because the Board has 90 days to issue a decision in major merger cases, it should be able to issue a decision in an expedited process more quickly than that.  (Id.)  The Board again declines to make this change.  AFPM does not explain why it believes the timeline for parties to comment in a rulemaking is analogous to the timeline for the Board to issue a decision in a rate case.  The merger deadline it cites is statutory, 49 U.S.C. § 11325(b)(3), and AFPM does not explain why Congress's reasoning with respect to a different type of proceeding must constrain the Board's reasoning with respect to the timing of FORR.

## PART VI – MARKET DOMINANCE

In the SNPRM, the Board proposed to give FORR complainants a choice between the streamlined and non-streamlined market dominance approaches.  SNPRM, EP 755 et al., slip op. at 41; Market Dominance Streamlined Approach, EP 756 (STB served Aug. 3, 2020) (adopting streamlined market dominance as an option in rate cases); 49 C.F.R. § 1111.12 (streamlined market dominance regulations).

BNSF argues that allowing non-streamlined market dominance will increase the time required in FORR cases, contrary to the Board's goals, because the Board will grant extensions of time. (See BNSF SNPRM Comment 3.) Although BNSF is correct that extensions of time are not prohibited in FORR, the Board intends to disfavor such requests strongly. Granting extensions of time in FORR cases would directly undermine one of the fundamental attributes of this process—using short time limits to constrain the volume and complexity of the record, which in turn would allow the Board to issue a decision expeditiously. See NPRM, EP 755 et al., slip op. at 6-7. For this reason, even extension requests to which both parties consent will be disfavored, and parties are encouraged not to spend the scarce time available under this procedure on preparing extension requests. Id., slip op. at 14; SNPRM, EP 755 et al., slip op. at 41 (specifically discouraging extension requests with respect to non-streamlined market dominance). Joint requests to allow time to negotiate a settlement, including joint requests for mediation, are an exception and will be considered by the Board.

BNSF also asserts that responding to a non-streamlined market dominance presentation will be more burdensome to a FORR defendant than a Three-Benchmark defendant because in FORR, the complainant "may pursue a novel rate reasonableness theory that will consume a disproportionate share of the railroad defendant's time and energy in preparing its responsive pleading." (BNSF SNPRM Comment 3-4.) But the SNPRM acknowledged the possible burden on defendants and accordingly tripled defendants' time for replies, from 10 days to 30 days, in cases where complainants choose non-streamlined market dominance. SNPRM, EP 755 et al., slip op. at 41. BNSF does not respond to the Board's reasoning for allowing complainants this choice: "[l]imiting FORR [to streamlined market dominance] could effectively deny access to FORR for many potential complainants—those who are unable to satisfy one or more of the streamlined factors—which is contrary to FORR's goal of improving access to rate reasonableness determinations." Id.

BNSF further contends that, "[i]f the Board chooses to permit shippers to use non-streamlined approaches to market dominance on the basis that the short time frame is a sufficient protection against the potential for evidentiary sprawl, then it is logical and proportionate to permit evidence of product and geographic competition when a shipper elects to use a non-streamlined market dominance presentation." (BNSF SNPRM Comment 4.) BNSF accurately observes that FORR has a significant "laboratory" element, (see id.), and relying on FORR's tight time frames to limit evidentiary volume in reference to product and geographic competition could merit consideration. See TRB Rep. 122 (observing that antitrust enforcement agencies are able to assess product and geographic competition in a short period of time because they strictly limit the time that parties have to compile evidence). However, consideration of whether to incorporate product and geographic competition in market dominance determinations has constituted entire rulemaking proceedings on its own,[31] and addressing it here would unduly expand the scope of this proceeding. Therefore, like the possibility of two-tiered relief, see SNPRM, EP 755 et al., slip op. at 47, and below, the Board will reserve this issue for possible future proceedings.

---

[31] See, e.g., Mkt. Dominance Determinations—Prod. & Geographic Competition, Docket No. EP 627; Pet. of the Ass'n of Am. R.R.s, Docket No. EP 717.

The Coalition Associations note that, in a FORR case where the complainant chooses streamlined market dominance, it would have the option of an evidentiary hearing before an administrative law judge to discuss market dominance, but if the complainant chooses non-streamlined market dominance, it would not have the option of a hearing. (Coalition Associations SNPRM Comment 4-5); SNPRM, EP 755 et al., slip op. at 39, 42. According to the Coalition Associations, "it is irrational and incongruous for the Board to permit rebuttal evidence in streamlined market-dominance cases but to prohibit it in non-streamlined cases." (Coalition Associations SNPRM Comment 5.) The Board acknowledges the apparent incongruity in these procedures. However, closer examination reveals that the procedure as proposed in the SNPRM is neither irrational nor incongruous. As an initial matter, the optional hearing in a FORR case using streamlined market dominance is not solely an opportunity for the complainant to present rebuttal; as the NPRM explained, if the complainant chooses a hearing, both sides would be permitted to present their market dominance positions. NPRM, EP 755 et al., slip op. at 10. But even to the extent the hearing allows for rebuttal, the Board disagrees with the Coalition Associations' claim that "the need for rebuttal is even greater in non-streamlined market-dominance cases." (Coalition Associations SNPRM Comment 5.) The opening submission of a complainant using streamlined market dominance is truly minimal, addressing only a specified list of factors and without the full evidentiary presentation that a complainant would typically submit in a case using non-streamlined market dominance. See Mkt. Dominance Streamlined Approach, EP 756, slip op. at 4, 27-28, 37 (STB served Aug. 3, 2020). Allowing such a minimal opening submission is by design, with the goal of overcoming the significant burdens in terms of cost and time that complainants can otherwise face in addressing market dominance. See id., slip op. at 1-3, 6-7. A complainant would have a greater need for rebuttal after submitting so little in its streamlined market dominance opening, as opposed to a non-streamlined market dominance case where the complainant has an opportunity on opening to present its complete position regarding market dominance.

Moreover, the Coalition Associations' proposed solution—bifurcating market dominance and rate reasonableness pleadings in FORR cases using non-streamlined market dominance, (see Coalition Associations NPRM Comment 14-15)—would substantially undercut FORR's use of short timelines to limit the volume and complexity of the evidentiary record. Contrary to Coalition Associations' claim, (Coalition Associations SNPRM Comment 7), their proposed addition of three rounds of market dominance pleadings would be disproportionate to FORR. The SNPRM observed that the various procedural additions proposed by parties, some of which the SNPRM adopted, would "detract[] from the Board's goal of a highly expedited procedural schedule." SNPRM, EP 755 et al., slip op. at 36. Compared to the longest version of the procedural schedule contemplated in the SNPRM, with a maximum of 96 days for record development, see id., slip op. at 36, 42, the Coalition Associations' maximum record development time of 129 days would constitute an expansion by greater than 30 percent. (See Coalition Associations NPRM Comment 10 (21 days for motions to compel); Coalition Associations SNPRM Comment 12 (108 days of record development excluding motions to compel).)

Notwithstanding their concerns about a lack of rebuttal with respect to market dominance in non-streamlined cases (Coalition Associations SNPRM Comment 6), the Coalition Associations have expressed strong support for FORR's rate reasonableness procedure, which does not include rebuttal. (See Coalition Associations NPRM Comment 2; Coalition

27

Associations SNPRM Comment 1.) The Board has heard rail customers' concerns about the duration of rate cases, see NPRM, EP 755 et al., slip op. at 3-4 & n.7, and FORR's simplified procedure is what permits its expedited timeline.

The SNPRM also proposed to require defendants to file market dominance presentations only on reply, rather than on opening. SNPRM, EP 755 et al., slip op. at 39-40. AFPM states that it has concerns with this approach and recommends, instead, that the Board return to its initial proposal of prohibiting complainants from using non-streamlined market dominance in FORR cases. (See AFPM SNPRM Comment 16.) AFPM, however, does not identify its specific concerns, nor does it respond to the Board's reasoning for eliminating FORR defendants' market dominance opening, see SNPRM, EP 755 et al., slip op. at 40, or its reasoning for allowing complainants to choose non-streamlined market dominance, see SNPRM, EP 755 et al., slip op. at 41. In fact, AFPM states that it does not oppose giving FORR complainants the choice between streamlined and non-streamlined market dominance. (See AFPM SNPRM Comment 17.)

## PART VII – RELIEF CAP

In the NPRM and SNPRM, the Board proposed to establish a relief cap of $4 million, indexed annually using the Producer Price Index, which would apply to an award of reparations,[32] a rate prescription or any combination of the two. NPRM, EP 755 et al., slip op. at 16; SNPRM, EP 755 et al., slip op. at 47. This is consistent with the potential relief afforded under the Three-Benchmark methodology.[33] SNPRM, EP 755 et al., slip op. at 42. The Board further proposed that any rate prescription be limited to no more than two years unless the parties agree to a different limit on relief. Id., slip op. at 42-43. Such a limit is one-fifth of the 10-year limit applied in SAC cases and less than half of the five-year limit applied in Simplified-SAC and Three-Benchmark cases, see Expanding Access to Rate Relief, EP 665 (Sub-No. 2), slip op. at 6, thereby accounting for the expedited deadlines of the FORR procedure.

AAR continues to argue that a $4 million dispute is not a small case, that the $4 million cap is arbitrary, and that the Board has not addressed disaggregation of claims. (See AAR SNPRM Comment 17.) AAR offers no support for its opinion that a $4 million case is not "small"—which is, of course, a relative term. See, e.g., Consumers Energy Co. v. CSX Transp., Inc., NOR 42142, slip op. at 44 (STB served Aug. 2, 2018) ($94.9 million in relief in a SAC case). AAR asserts that the $4 million cap is arbitrary and suggests that the Board has not provided a rationale to support it. But the Board did in fact provide that rationale, which AAR does not mention despite its appearance in both the NPRM and SNPRM. NPRM, EP 755 et al.,

---

[32] The standard reparations period reaches back two years prior to the date of the complaint. 49 U.S.C. § 11705(c) (requiring that complaint to recover damages under 49 U.S.C. § 11704(b) be filed with the Board within two years after the claim accrues).

[33] The relief cap will incorporate indexing that has previously been applied to the Three-Benchmark cap, so that the cap for FORR is the same as the cap for Three-Benchmark. The Board confirms, pursuant to the Coalition Associations' request, that the FORR relief cap matches the Three-Benchmark cap, including indexing from 2007. (See Coalition Associations SNPRM Comment 9.)

slip op. at 16 ("[a]pplying a relief cap based on the estimated cost to bring a Simplified-SAC case would further the Board's intention that Three-Benchmark and FORR be used in the smallest cases, and applying the same $4 million relief cap, as indexed, would provide consistency in terms of defining that category of case."); SNPRM, EP 755 et al., slip op. at 43 (same).[34]

With respect to disaggregation of claims, AAR fails to acknowledge that the SNPRM proposed the same case-specific approach that the Board has had in place since 2007 for all small rate cases. SNPRM, EP 755 et al., slip op. at 44-45. As the Board explained in Simplified Standards, "[i]t is not clear that such a mechanism is necessary at this time. The Board has ample discretion to protect the integrity of its processes from abuse, and we should be able to readily detect and remedy improper attempts by a shipper to disaggregate a large claim into a number of smaller claims, as the shipper must bring these numerous smaller cases to the Board." Simplified Standards, EP 646 (Sub-No. 1), slip op. at 32-33.

The Coalition Associations state that they "seek clarification as to when the two-year window for applying the relief cap begins. The statute clearly allows for two years of reparations, which could result in the entire relief period occurring prior to the date of the complaint. It also is clear that a complainant could elect to forego pre-complaint reparations and apply the relief period from the date of the complaint." (Coalition Associations SNPRM Comment 10.) As the SNPRM stated, the combined cap is identical to the one adopted for Three-Benchmark cases. SNPRM, EP 755 et al., slip op. at 45. In a Three-Benchmark case, as in any other rate reasonableness case, a complainant can choose to seek reparations, a rate prescription, or both. See, e.g., Grain Land Coop, NOR 41687, slip op. at 5 ("In its amended complaint, Grain Land must indicate what rates it is challenging (by tariff reference, tariff item number(s), and specific points from and to which the rates apply) and what relief it seeks (i.e., *rate prescription and/or reparations*).") (emphasis added); Sunbelt Chlor Alkali P'ship v. Norfolk S. Ry., NOR 42130, slip op. at 29 (STB served June 20, 2014) (describing statutory contrasts between reparations and rate prescription). FORR complainants, accordingly, will have the same options.

Contrary to the Coalition Associations' suggestion, however, if a complainant decides to forgo reparations and seek only a prescription, the transition from reparations to prescription occurs on the effective date of the prescription order—i.e., the date by which the defendant must reduce its rate in compliance with the order. See, e.g., Ariz. Pub. Serv. Co. v. Atchison, Topeka

---

[34] See also Coalition Associations SNPRM Reply Comment 16-17 ("AAR assumes that Three Benchmark is the next-more-complicated method when, in fact, FORR is on par with Three Benchmark; it is an alternative to Three Benchmark for small cases, not a less complicated method. Indeed, FORR conceivably could be more complicated than Three Benchmark, depending upon the methodologies that the parties present."); SNPRM, EP 755 et al., slip op. at 43-44 ("By applying fast timelines and a simplified procedure, the Board intends that FORR would be less costly to litigate, but that does not inevitably mean the analysis is less accurate. Parties' ability to choose their methodology would allow the use of analyses that are equally accurate or more accurate, if the party presenting it can prepare the analysis quickly enough to present it in the time available.").

& Santa Fe Ry., NOR 41185, slip op. at 20 (STB served July 29, 1997) (ordering defendant to reduce its rates within 60 days of decision). Therefore, when a complainant chooses to forgo reparations, that includes reparations between the complaint date and the effective date of the prescription order. The alternative proposed by the Coalition Associations—in which the relief period begins "on a date to be determined solely by the complainant," (Coalition Associations SNPRM Comment 10)—would unreasonably allow complainants to choose a relief period that is entirely disconnected from the conduct found unlawful by the Board. (See AAR SNPRM Reply Comment 7-8.) The Coalition Associations express concern that a FORR complainant could receive only reparations, without any prospective relief. (See Coalition Associations SNPRM Comment 10.) But that possibility exists in Three-Benchmark cases as well, if the complainant receives pre-complaint reparations that exhaust the $4 million cap.

In the SNPRM, the Board proposed not to adopt a two-tiered relief structure—in which the top tier has a longer procedural schedule and no limit on the size of the relief—at this time, noting that, "[i]n the future, the Board could assess whether FORR may be appropriate for larger disputes." SNPRM, EP 755 et al., slip op. at 47. IMA-NA, Indorama, and AFPM take issue with this proposal, asking that the Board instead adopt two-tiered relief immediately. (See IMA-NA SNPRM Comment 16-17; Indorama SNPRM Comment 16-17; AFPM Comment 18.[35]) This request will be declined, as it was at the SNPRM stage. The Board proposed FORR to resolve small rate disputes. NPRM, EP 755 et al., slip op. at 7. Expanding the scope of this rulemaking to address large rate cases as well would delay that important and time-sensitive goal. IMA-NA and Indorama argue that "[t]he Board has ample evidence that this model is effective and will not cause an onslaught of rate cases based on the history of this process in Canada . . . ." (IMA-NA SNPRM Comment 16; Indorama SNPRM Comment 16.) But as IMA-NA and Indorama acknowledge, FORR is not the same as the Canadian process. (See id.) Canadian final offer arbitration is informal, confidential, and non-precedential, and is conducted by an arbitrator—it is alternative dispute resolution rather than adjudication. FORR, by contrast, is an innovative attempt to incorporate a final offer procedure into an agency adjudication, leading to public, precedential decisions subject to the APA's requirements for reasoned decision-making. A new approach is necessary in light of the Board's protracted search for a small rate dispute process that is accessible to shippers, see NPRM, EP 755 et al., slip op. at 2-5, and FORR offers a promising opportunity. But it would be premature to conclude, as IMA-NA and Indorama do, that there is "ample evidence that this model is effective."

Accordingly, the Board will adopt the relief cap proposed in the NPRM and SNPRM.

### PART VIII – MISCELLANEOUS ISSUES

AAR contends that the Board has not explained why it is not applying the conclusions of InterVISTAS Consulting Inc. (InterVISTAS), a consultant that prepared a report for the Board in

---

[35] AFPM expresses concern that railroads could "game" the relief cap "by setting high initial rates such that any relief cap will be quickly exhausted" and argues that a two-tier cap would alleviate that concern. (AFPM Comment 18.) As the SNPRM stated in response to similar arguments, the Board anticipates addressing such conduct in individual cases should it happen, and the Board will retain the ability to revise its processes to counteract any abuses that may arise. See SNPRM, EP 755 et al., slip op. at 46.

2016.[36]  (See AAR SNPRM Comment 15.)  However, AAR cites the page of the SNPRM that provides that explanation.  See SNPRM, EP 755 et al., slip op. at 47 (noting, among other things, that the Board was not bound by the study).  AAR claims that InterVISTAS "reject[ed] final-offer decisionmaking as an alternative way for the Board to decide rate disputes."  (AAR SNPRM Comment 15.)  But in fact, InterVISTAS did not reject final offer procedures for any substantive reason, or even address final offer procedures substantively in the first place.  See InterVISTAS Rep. 76.  Instead, InterVISTAS merely declined to draw any conclusions from the Canadian final offer process due to its confidentiality.  See id. ("[T]he non-transparent final offer arbitration process used in Canada to constrain undue exercise of any market power by railways provides *no guidance for alternatives to SAC*.  It may be that the methodologies put forward by one party or the other in the arbitrations could provide insight, but as the process is confidential, *no guidance can be provided*.") (emphasis added).  And in any event, AAR fails to identify any particular substance of the InterVISTAS report that it contends the Board has not addressed.

Finally, AAR repeats its arguments that the Board must conduct a cost-benefit analysis. (See AAR SNPRM Comment 19.)  The Board's responses in the SNPRM continue to apply, including the fact that Executive Order 12866 does not apply to "independent regulatory agencies" such as the Board, see 49 U.S.C. § 1301(a), and that the Board has carefully considered the need for regulatory reform, FORR's anticipated benefits and burdens, and alternative approaches, including the comparison group approach proposed in Docket No. EP 665 (Sub-No. 2).  See SNPRM, EP 755 et al., slip op. at 49 n.75.  It is true that the SNPRM did not address AAR's reliance on the Policies and Procedures for Rulemakings of the U.S. Department of Transportation (DOT).  But as AAR acknowledged (AAR NPRM Comment 26), DOT's requirements do not apply to the Board.  See also Vt. Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council, 435 U.S. 519, 524-25, 543-48 (1978) ("Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them.").

DOCKET NO. EP 665 (SUB-NO. 2)

The Board received no further comment on its proposal to close Docket No. EP 665 (Sub-No. 2), and therefore will proceed to terminate that proceeding.  As noted in the SNPRM, the Board may revisit some of the ideas presented in Docket No. EP 665 (Sub-No. 2) depending on future developments and whether additional steps in the small rate dispute context appear necessary.

Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. §§ 601-612, generally requires a description and analysis of new rules that would have a significant economic impact on a substantial number of small entities.  In drafting a rule, an agency is required to:  (1) assess the effect that its regulation will have on small entities; (2) analyze effective alternatives that may minimize a regulation's impact; and (3) make the analysis available for public comment.  §§ 601-

---

[36] An Examination of the STB's Approach to Freight Rail Rate Regul. & Options for Simplification (InterVISTAS Report), InterVISTAS Consulting Inc., Sept. 14, 2016, available at https://www.stb.gov/wp-content/uploads/STB-Rate-Regulation-Final-Report.pdf.

604. In its notice of proposed rulemaking, the agency must either include an initial regulatory flexibility analysis, § 603(a), or certify that proposed rule would not have a "significant impact on a substantial number of small entities," § 605(b). The impact must be a direct impact on small entities "whose conduct is circumscribed or mandated" by the proposed rule. White Eagle Coop. v. Conner, 553 F.3d 467, 480 (7th Cir. 2009).

In the SNPRM, the Board certified under 5 U.S.C. § 605(b) that the proposed rule would not have a significant economic impact on a substantial number of small entities within the meaning of the RFA.[37] The Board explained that its proposed changes to its regulations would not mandate or circumscribe the conduct of small entities. The rule requires no additional recordkeeping by small railroads or any reporting of additional information. Nor do these rules circumscribe or mandate any conduct by small railroads that is not already required by statute: the establishment of reasonable transportation rates when a carrier is found to be market dominant. As the Board noted, small railroads have always been subject to rate reasonableness complaints and their associated litigation costs, the latter of which the Board expects will be reduced through the use of this procedure.

Additionally, the Board concluded (as it has in past proceedings) that the majority of railroads involved in these rate proceedings are not small entities within the meaning of the Regulatory Flexibility Act. SNPRM, EP 755 et al., slip op. at 50-51 (citing Simplified Standards, EP 646 (Sub-No. 1), slip op. at 33-34). Since the inception of the Board in 1996, only three of the 51 cases filed challenging the reasonableness of freight rail rates have involved a Class III rail carrier as a defendant. Those three cases involved a total of 13 Class III rail carriers. The Board estimated that there are approximately 656 Class III rail carriers. Therefore, the Board certified under 5 U.S.C. § 605(b) that the proposed rule, if promulgated, would not have a significant economic impact on a substantial number of small entities within the meaning of the RFA.

This final rule adopts the approach proposed in the SNPRM, and the same basis for the Board's certification in the SNPRM applies to the final rule. Therefore, the Board certifies under 5 U.S.C. § 605(b) that the final rule will not have a significant economic impact on a substantial number of small entities within the meaning of the RFA. A copy of this decision will be served upon the Chief Counsel for Advocacy, Office of Advocacy, U.S. Small Business Administration, Washington, DC 20416.

### Paperwork Reduction Act

In this proceeding, the Board modifies an existing collection of information that was approved by the Office of Management and Budget (OMB) under the collection of Complaints (OMB Control No. 2140-0029). In the NPRM, the Board sought comments pursuant to the Paperwork Reduction Act (PRA), 44 U.S.C. §§ 3501-3549, and OMB regulations at 5 C.F.R. § 1320.8(d)(3) regarding: (1) whether the collection of information, as modified in the proposed

---

[37] For the purpose of RFA analysis for rail carriers subject to Board jurisdiction, the Board defines a "small business" as only including those rail carriers classified as Class III rail carriers under 49 C.F.R. part 1201, General Instructions § 1-1. See Small Entity Size Standards Under the Regul. Flexibility Act, EP 719 (STB served June 30, 2016).

Appellate Case: 22-3648      Page: 36      Date Filed: 12/27/2022 Entry ID: 5230620

rule in the Appendix, is necessary for the proper performance of the functions of the Board, including whether the collection has practical utility; (2) the accuracy of the Board's burden estimates; (3) ways to enhance the quality, utility, and clarity of the information collected; and (4) ways to minimize the burden of the collection of information on the respondents, including the use of automated collection techniques or other forms of information technology, when appropriate.  No further comments were received following the SNPRM.

This modification and extension request of an existing, approved collection will be submitted to OMB for review as required under the PRA, 44 U.S.C. § 3507(d), and 5 C.F.R. § 1320.11.  The request will address the comment discussed in the SNPRM as part of the PRA approval process.  See SNPRM, EP 755 et al., slip op. at 51-52.

Congressional Review Act

Pursuant to the Congressional Review Act, 5 U.S.C. §§ 801-808, the Office of Information and Regulatory Affairs has designated this rule as non-major, as defined by 5 U.S.C. § 804(2).

List of Subjects

49 C.F.R. Part 1002

Administrative practice and procedure, Common Carriers, Freedom of information.

49 C.F.R. Part 1111

Administrative practice and procedure, Investigations.

49 C.F.R. Part 1114

Administrative practice and procedure.

49 C.F.R. Part 1115

Administrative practice and procedure.

It is ordered:

1. The Board adopts the final rule as set forth in this decision.  Notice of the adopted rule will be published in the Federal Register.

2. A copy of this decision will be served upon the Chief Counsel for Advocacy, Office of Advocacy, U.S. Small Business Administration.

3. The final rule in Docket No. EP 755 is effective sixty days after notice of this decision is published in the Federal Register.

4. The termination of Docket No. EP 665 (Sub-No. 2) is effective on January 3, 2023.

By the Board, Board Members Fuchs, Hedlund, Oberman, Primus, and Schultz.  Board Members Fuchs and Schultz dissented with separate expressions.

_____

BOARD MEMBER FUCHS, dissenting:

Congress has entrusted the Board with the responsibility to regulate rail carriers' rates, and it has set broad criteria under which the Board is to apply its expertise and judgment.[1]  This final rule (<u>FORR Final Rule</u>) is the culmination of diligent work and tireless leadership to reform the Board's approach to rate review.  Recognizing the potential benefits of reform, as well as the importance of further stimulating new ideas, I voted to propose FORR and twice solicit public comment.[2]  After careful consideration of those comments, however, I have concluded that FORR is not the answer.  FORR is an evasion of the Board's fundamental responsibility because it makes the Board entirely dependent on litigants' self-determined rate review methodologies, gives little meaningful guidance for those methodologies, and prohibits the Board from devising its own remedy where necessary.  Making matters worse, FORR subjects those litigants to a process with intensified and unequal pressure, thereby incentivizing them to prioritize litigation strategy over their best interpretation of facts and statutory criteria.  This deeply flawed, all-or-nothing process immediately generates uncertainty for industry participants, and it presents unique risks that its pressures and precedent will cause significant negative effects on our nation's rail network.  Rather than issuing <u>FORR Final Rule</u>, the Board should have recognized the irreparable problems with FORR and instead pursued other reforms while it facilitates an additional process to resolve rate disputes via the agency's new arbitration program.

Though the Board has stated its role in regulating rates is to serve as "guardian of the public interest,"[3] FORR reduces the agency to mere passive, all-or-nothing selections based only on litigants' methodologies and proposed remedies.  In FORR, the Board does not set its own methodology that gives clear, specific meaning to the statutory criteria, and <u>FORR Final Rule</u> argues that the Board similarly does not have a defined methodology in reasonable practice and common carrier obligation disputes.  However, in those types of cases, unlike in FORR, the

_____

[1]  <u>See</u> 49 U.S.C. § 10101 (rail transportation policy); 49 U.S.C. § 10701(d)(2) (listing the Long-Cannon factors); 49 U.S.C. § 10701(d)(3) (directing the Board to establish "one or more simplified and expedited methods for determining the reasonableness of challenged rail rates in those cases in which a full stand-alone cost presentation is too costly, given the value of the case"); 49 U.S.C. § 10702 (jurisdiction to establish reasonable rates); 49 U.S.C. § 10704(a)(2) (requiring the Board to make an "adequate and continuing effort" to assist carriers in attaining adequate revenue levels).

[2]  <u>See</u> <u>NPRM</u>, EP 755 et al.; <u>SNPRM</u>, EP 755 et al.

[3]  <u>See</u> <u>Pub. Serv Co. of Colo. v. Burlington N. & Santa Fe Ry.</u>, NOR 42057, slip op. at 3-4 (STB served Jan. 19, 2005) (in the rate reasonableness context, the Board's "role as the guardian of the public interest is unchanged," in that, like its predecessor, it is "expected to be directly and immediately concerned with the outcome of virtually all proceedings conducted before it. . . . not . . . a passive arbiter but the guardian of the general public interest, with a duty to see that this interest is at all times effectively protected" (internal citations omitted)).

Board retains discretion to best implement the relevant statutory criteria because it may reject parts or all of parties' arguments and devise its own remedy based on its expertise and judgment. FORR Final Rule further argues that the Board currently gives up discretion in the Three-Benchmark rate review methodology because it uses a final offer process for picking comparison groups. However, when it established Three-Benchmark, the Board exercised considerable discretion to guard the public interest and give specific meaning to statutory criteria—based on its own expertise and judgement—by, among other things, defining a formula that accounts for the level of revenue adequacy to be achieved through a rail carrier's rate-setting.[4] By contrast, FORR offers little useful guidance, let alone a methodology, on fundamental concepts like revenue adequacy and differential pricing.[5] FORR is unique among the agency's processes in that the Board evades responsibility on *both* the front and back ends—neither defining methodologies in advance nor permitting the Board's own remedies in individual cases.

Not only does FORR turn over the Board's responsibility to litigants, it diminishes the Board's ability to pick the best outcome based on the litigants' presentations. In a FORR case, suppose the Board, relying on a litigant's rate reasonableness methodology, finds a rate unreasonable. The Board would then turn to the litigants' final offers to prescribe the maximum rate. However, in FORR, the maximum rate need not arise out of litigants' rate reasonableness methodologies. Instead, litigants' final offers can use different reasoning, or even altogether different methodologies. They must simply submit "explanation and support for" their final offers. See FORR Final Rule, EP 755 et al., slip op. at 19, 38. This may lead to suboptimal outcomes. For example, in one scenario, FORR requires the Board to prescribe a maximum rate

---

[4] See Rate Guidelines—Non-Coal Proceedings, EP 347 (Sub-No. 2), 1 STB 1004, 1027-34 (1996) (describing RSAM, the revenue shortfall allocation method); id. at 1042 (describing the revenue need adjustment factor, which is the ratio of RSAM ÷ R/VC$_{>180}$); id. at 1020 (listing how the proposed factors implement the criteria including the Long-Cannon factors, differential pricing, and revenue adequacy); see also Simplified Standards for Rail Rate Cases, EP 646 (Sub-No. 1), slip op at 4-5 (STB served July 28, 2006) (discussing the rail transportation policy, Long-Cannon factors, revenue adequacy, and the need to establish a simplified and expedited method for determining rate reasonableness in cases where a stand-alone cost presentation is too costly, given the value of the case).

[5] FORR Final Rule's comparison between FORR and "Maximum Markup Methodology," or MMM, is misplaced. See FORR Final Rule, EP 755 et al, slip op. at 11 (citing Major Issues in Rail Rate Cases, EP 657 (Sub-No. 1), slip op. at 14-15, (STB served Oct. 30, 2006), aff'd sub nom. BNSF Ry. v. STB, 526 F.3d 770 (D.C. Cir. 2008)); see also Major Issues, EP 657 (Sub-No. 1), slip op at 9-11, 14-15, 23 n.44) (establishing, as one part of the Board's effort to address six recurring issues in stand-alone cost (SAC) cases, MMM, which is used to prescribe rates as part of the SAC methodology). First, unlike FORR, SAC is a methodology in which the agency—using its expertise and judgment—gives clear, specific meaning to the statutory criteria by defining a railroad's revenue needs and permissible differential pricing through the prism of contestability theory and so-called constrained market pricing (i.e., based on a stand-alone railroad's revenue needs). Second, again unlike FORR, the Board in a SAC case arrives at the amount of excess revenue, subject to MMM, only after using its expertise and judgment to resolve many individual disputes, often involving hundreds of small details. It is not forced to simply take a litigant's entire presentation.

using a litigant's final offer even when a litigant's rate reasonableness methodology readily shows a different maximum rate that the Board would view better implements the statutory criteria. In another scenario, FORR prevents the Board from remedying an unreasonable rate[6] if the Board finds the complainant's final offer does not have support, even though the statute requires a rail carrier to establish reasonable rates. Thus, working within the binary selection process that FORR imposes, in some cases the Board cannot even select obvious, superior solutions or correct unreasonableness.

Today's decision might accept these severe, unprecedented limitations in hopes that a final offer framework—by virtue of its design—will produce good outcomes, but FORR Final Rule offers inadequate support for this proposition. The theory behind a final offer framework is that the prospect of an all-or-nothing decision imposes acute uncertainty and raises the costs of losing, such that parties are more likely to settle and make presentations that converge toward the middle ground.[7] FORR Final Rule offers no evidence that a final offer framework is welfare-improving in contexts similar to rate regulation. If convergence were the sole desired effect, even FORR Final Rule's supporting literature—largely based on public sector bargaining and baseball arbitration—acknowledges the unresolved debate over whether final offers converge.[8] When cases are decided in the absence of convergence, FORR may have unintended distributional consequences across individual shippers because all-or-nothing final offer frameworks have more variance than other processes—that is, similarly-situated litigants have very different results because the decision-maker is unable to split the difference where necessary.[9] This dynamic has the potential to distort competition, particularly among shippers.

---

[6] Here, the term "unreasonable rate" means that the Board would find that rate unreasonable based on the methodologies presented, not that the Board necessarily would issue a formal ruling just on that matter.

[7] "Early proponents of final offer arbitration [(FOA)] argued that FOA would lead to convergence in the offers of the two parties. The theory originating with Stevens (1966) was that conventional arbitration had a 'chilling' effect on negotiations and offers because the parties were motivated to make extreme offers when facing an arbitrator who was thought to 'split the difference.'" Comm'n on Health & Safety & Workers' Comp., Cal. Dep't Indus. Rels., Literature Review: Final Offer Arbitration, https://www.dir.ca.gov/chswc/basebalarbffinal.htm (last visited Dec. 16, 2022) (internal citations omitted); but see id. ("[C]onvergence of the offers under FOA compared to conventional arbitration is not a sufficient condition for 'better' decisions by the arbitrator given that the arbitrator can choose only one or the other."); see also Steven Brams & Samuel Merrill, Equilibrium Strategies for Final-Offer Arbitration: There is No Median Convergence, MGMT. SCI. 927 (1983).

[8] See Chetwynd, Baseball? An Analysis of Final-Offer Arbitration, its Use in Major League Baseball & its Potential Applicability to European Football Wage & Transfer Disputes, 20 MARQUETTE SPORTS L. REV. 109, 117, 134 (2009); Carrell & Bales, Considering Final Offer Arbitration to Resolve Public Sector Impasses in Times of Concession Bargaining, 28 OHIO STATE J. OF DISP. RESOL. 1, 30-32 (2013).

[9] Comm'n on Health & Safety & Workers' Comp., supra.

More alarmingly, FORR has a fundamental flaw in its framework—as <u>FORR Final Rule</u> acknowledges, this process, unlike some other final offer frameworks in different contexts, does not impose "reciprocal risks." <u>See</u> <u>FORR Final Rule</u>, EP 755 et al., slip op. at 19. If participants in a final offer process do not have equivalent risks, the more risk adverse party will likely give up more—not because its case is worse—simply because an all-or-nothing process increases the expected costs of losing.[10] Here, the rail carrier appears to be the more risk averse party because the range of outcomes in FORR are limited to either the status quo or a rate reduction.[11] As a result, FORR may have an especially coercive, unequal effect on settlements and final offers. In practice, to reduce the probability of losing to a complainant's offer in its entirety, a rail carrier may be more likely to pursue a middle ground that is not best for the network and other shippers. Thus, in FORR, litigants—on whom the Board entirely relies—are incentivized to pursue arguments and outcomes not based on their best interpretation of market or network facts and the relevant criteria but instead on litigation strategies.

Given these deep and irreparable flaws, FORR could have significant negative consequences for the rail network. FORR's decisions are precedential, so one litigant's rate reasonableness methodology—for which the Board would not find best implements the statutory criteria, let alone seek broader public comment or analyze effects across carriers—could affect rail rates nationwide, potentially impacting infrastructure and operations. Moreover, as noted above, the intensified and unequal pressures in FORR could affect the network even in the absence of a Board decision. Because <u>FORR Final Rule</u> does little to define FORR's broad criteria or give guidance to litigants, effects will be felt immediately in the form of particularly acute uncertainty. Notably, final offer arbitration in Canada, as well as the Board's arbitration program released today, largely avoid these problems. Though both share some characteristics of the FORR process, both are confidential, and—in the case of the Board's arbitration program—the arbitration panel may devise a welfare-improving remedy distinct from the parties' presentations.[12] That is not to say that confidentiality, and non-precedential decisions generally, ought to be norm for the Board. However, where, as in FORR, the Board evades its

---

[10] <u>See</u> Henry S. Farber, <u>An Analysis of Final Offer Arbitration</u>, J. of Conflict Resol. 683 (1980); see also Comm'n on Health & Safety & Workers' Comp., <u>supra</u> (stating "economic theory as reviewed earlier suggests that the more risk averse party will have poorer outcomes on average under this type of arbitration" and finding on a preliminary basis "there would appear to be enough non anecdotal evidence to conclude that baseball arbitration is neither working satisfactorily nor producing fair" outcomes); <u>id.</u> (citing Amy Farmer Curry & Paul Pecornio, <u>The Use of Final Offer Arbitration as a Screening Device</u>, J. of Conflict Resol. 655 (1993)).

[11] That is not to say that, as <u>FORR Final Rule</u> outlines, shippers do not experience any costs from the process or that litigants do not have relationship reasons to reduce the potency of this absence of reciprocity. However, as <u>FORR Final Rule</u> acknowledges, there is no escaping that the potential effects on rates are unequal. <u>See</u> <u>FORR Final Rule</u>, EP 755 et al., slip op. at 19-21.

[12] <u>See</u> <u>Joint Pet. for Rulemaking to Establish a Voluntary Arb. Program for Small Rate Disps.</u>, EP 765, slip op. at 57-60, 75 (STB served December 19, 2022); Canada Transp. Act, S.C. 1996, c. 10, as amended, § 167 (Can.). <u>Cf.</u> <u>FORR Final Rule</u>, EP 755 et al., slip op. at 1.

Appellate Case: 22-3648     Page: 41     Date Filed: 12/27/2022 Entry ID: 5230620

responsibility and sets forth a flawed process, the broader public faces high risks of negative outcomes.

The Board's drastic shift to FORR is not justified by <u>FORR Final Rule</u>'s analysis. <u>FORR Final Rule</u> states that shippers need a more accessible rate review option, but it does not fully analyze the extent to which this need is the result of high litigation costs rather than economic methodologies that have high standards for relief. The <u>SNPRM</u> claims that the cost of Three-Benchmark appears to be one-eighth (and possibly less) of the potential relief, and it is unclear whether <u>FORR Final Rule</u> finds that this ratio makes the methodology cost-prohibitive.[13] If <u>FORR Final Rule</u>'s accessibility statement is only about litigation costs, <u>FORR Final Rule</u> does not establish that FORR would be less costly than Three-Benchmark. Both have final offer components, but Three-Benchmark sets the basic economic methodology in advance, whereas FORR requires litigants to create their own methodology and reasoning. Further, many of FORR's procedural changes that purport to reduce litigation costs, and other changes suggested by the Rate Reform Task Force (RRTF), such as page limits, are easily applied to Three-Benchmark.[14] That the Board does not simply streamline Three-Benchmark suggests that <u>FORR Final Rule</u>'s problem statement is perhaps less about costs and more about the standards—even the economic foundations—of the Board's existing rate review methodologies.[15] However, despite robust ideas from both the RRTF and the public, the Board does not explain why it is impractical to improve the standards in the Board's existing methodologies, or—if those methodologies are unsound—to create a new methodology. Without fully analyzing the underlying the problem and available solutions, the Board has insufficient basis for turning away from its traditional reliance on methodologies, foregoing its discretion to devise its own remedies, and relying on litigants to do the work of the agency.

Though I disagree with <u>FORR Final Rule</u>, I am not proposing to do nothing. I support facilitating an additional process to resolve rate disputes via the agency's new arbitration program. Given today's decisions, I find the best way forward is to continue to pursue a new or revised rate review methodology, as well as other actions that can improve the Board's regulations. The Board has before it several ideas from the RRTF, contracted experts, and the

---

[13] <u>See</u> <u>SNPRM</u>, EP 755 et al., slip op. at 43 n.67 ("But the most recently reported estimate of the cost to litigate a Three-Benchmark case is actually $500,000 based on a case completed in 2010.") (citing US Magnesium, L.L.C. Comment, V.S. Howard Kaplan 4, Oct. 23, 2012, <u>Rate Regul. Reforms</u>, EP 715).

[14] <u>See</u> <u>RRTF Report</u> 51-52 (discussing possible benefits of page limits). The Board also does not engage with the possibility of using statistical methods, extant data, and automation to improve its rate review processes, as suggested by the RRTF and others. <u>See, e.g.</u>, <u>RRTF Report</u> 10, 24-30.

[15] This is not meant imply that there is not room for potential improvements to the Three-Benchmark methodology. Indeed, shippers, railroads, and Board staff have all suggested new approaches to a comparison group methodology. (<u>See</u> NGFA Reply 6-7; AAR Comment, Oct. 22, 2019); <u>see also</u> AAR Comment 79-80, Nov. 26, 2019, <u>Hearing on Revenue Adequacy</u>, EP 761; <u>Rail Transportation of Grain, Rate Regulation Review</u>, EP 665 (Sub-No. 1), slip op. at 12-15 (STB served Aug. 31, 2016); <u>RRTF Report</u> 20-21.

Appellate Case: 22-3648      Page: 42      Date Filed: 12/27/2022 Entry ID: 5230620

broader public. I favor streamlined processes for rate review and clear rules—specified, practical methodologies and standards that both protect the broader public and allow industry participants to operate their businesses and resolve disputes absent further government intervention. Rate review reform efforts, and the broader consideration of the Board's role in regulating the rail industry, must not stop because of a deeply flawed, highly risky final rule. I respectfully dissent.

---

BOARD MEMBER SCHULTZ, dissenting:

For several years, shippers and other interested parties have repeatedly informed the Board that the Board's current options for challenging the reasonableness of rates do not meet their need for an expeditious resolution at a reasonable cost. While I am aware of the need for additional methodologies, I respectfully dissent from today's decision to finalize Final Offer Rate Review (FORR).

The Board issued its Supplemental Notice of Proposed Rulemaking (SNPRM) in this proceeding concurrently with the Notice of Proposed Rulemaking in Joint Petition for Rulemaking to Establish a Voluntary Arbitration Program for Small Rate Disputes, Docket No. EP 765, "so that both proposals may be considered simultaneously, including the pros and cons of adopting—either with or without modification—the voluntary arbitration rule, FORR, both proposals, or taking other action." Final Offer Rate Review (SNPRM), EP 755 et al., slip op. at 8 (STB served Nov. 15, 2021). While I voted in favor of the FORR SNPRM, I did so because I thought it was important to be able to meet with stakeholders about both FORR and the Board's proposed small case rate arbitration program (Arbitration) in Docket No. EP 765, as well as for stakeholders to be able to review and comment on both proposals at the same time. Id. at 54 (Board Member Schultz, concurring). I was not in favor of the Board adopting both rules, and the Board's action today—simultaneously issuing final rules in this docket and in Docket No. EP 765 while tying them together—is unprecedented and unnecessary. In so doing, the Board has injected a level of uncertainty and unpredictability into a process that should be predictable and consistent. Moreover, I believe Arbitration is a much better option for both shippers and carriers primarily because it affords the parties their due process and statutory rights to be heard on the merits.[1] The majority's decision to adopt FORR simultaneously with Arbitration creates the possibility that while both programs will be enacted, FORR could remain in law but go unused if all seven Class I carriers sign up for Arbitration.[2] It is for these reasons that I believe Arbitration should have been advanced without the "backstop" of FORR. Beyond my concerns about the rulemaking process, I also have deep legal and practical concerns about FORR, which I believe prevents the Board from engaging in reasoned decision-making, fails to properly align risk between complainants and defendants, and could depress rail rates below what is reasonable.

---

[1] Unlike FORR, Arbitration will allow neutral arbitrators to determine a reasonable rate as the Board does under the Board's current options for challenging the reasonableness of rates.

[2] Of course, if even one carrier declines to sign up for Arbitration, that program instead will go unused.

Reasoned Decision-Making

The need for new rate review methodologies is well documented.  In September 2014, the Board commissioned an independent assessment of the stand-alone rate reasonableness methodology as well as possible alternatives that could reduce the time, complexity, and expense involved in rate cases.  In January 2018, Chairman Ann Begeman created the Rate Reform Task Force to recommend improvements to existing processes and to propose new rate review methodologies.  And while the need for alternatives to the existing methodologies is clear, that need cannot supersede the Board's congressionally delegated authority to either establish rates based upon its own best judgment or to promulgate regulations allowing parties to seek similar relief through a voluntary arbitration program, see 49 U.S.C. § 11708.  Unlike the process in Arbitration, FORR would require the Board to choose between two rates—even if the Board finds the correct outcome falls above, below, or somewhere in between the two submissions. It is this limitation on the Board's ability to exercise its own judgment by weighing each side's arguments, evaluating the evidence, and considering both the public interest and rail transportation policy that I find to be so troubling.  Agencies must engage in reasoned decision-making.  See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 52 (1983).  While the Board, after finding a challenged rate to be unlawful, has the discretion to determine the "maximum rate . . . to be followed," 49 U.S.C. § 10704(a)(1), the Board must "exercise its discretion in a reasoned manner."  Judulang v. Holder, 565 U.S. 42, 53 (2011).  The Board's ability to discern the best outcome and remain evenhanded will depend upon the reasonableness of the submissions made by the parties themselves.  And while the majority continues to presume that "FORR would not reward extreme positions" and that "parties likely would have greater success by presenting more moderate proposals," SNPRM, EP 755 et al., slip op. at 17, I am not convinced this will be the case in all instances.  See also FORR Final Rule, EP 755 et al., slip op. at 9 ("[A] final offer selection process would discourage extreme positions . . . .").  Perhaps more importantly, I believe the Board's congressionally authorized responsibility to provide regulatory oversight of rates requires more than a reliance upon two submitted proposals.  It requires the Board to actually exercise its discretion and decision-making authority.

Alignment of Risk

The majority believes that FORR—like the final-offer arbitration (or "baseball arbitration") process on which FORR is based—will not reward extreme positions, thereby incentivizing both parties to submit their most reasonable rate to the Board.  See, e.g., id. at 6, 9.  However, unlike baseball arbitration, in which each side has something to lose because the arbitrator can select an offer that puts either side in a worse position than it occupied pre-arbitration, in a FORR case, the Board is not authorized to prescribe a rate higher than the challenged rate.  Therefore, a FORR complainant has no risk of a decision that places it in a worse position.  Without that risk, a FORR complainant literally has nothing to lose and, therefore, no reason to moderate their position, especially when the Board will only consider the final offers after it has already found the challenged rate to be unreasonable.  By the same token, the defendant carrier will know that the complainant has no incentive to moderate its position. This could result in a Class I carrier submitting a lower offer than it otherwise would to reduce the risk that the Board will select the complainant's extreme position.  If FORR systematically

pushes carriers to submit lower offers without encouraging shippers to submit higher offers, the effect over time would be to depress railroad rates—not due to rates being unreasonable, but merely because of the structure of FORR itself. Moreover, because these decisions will not be confidential, they will most likely impact rates throughout the freight rail network for years if not decades to come, resulting in inconsistent and unpredictable rate setting.[3]

Conclusion

The need for a streamlined, cost-effective dispute resolution process that provides both consistent deliberation of evidence and reliable outcomes is clear. But that need should not be met by a process that restricts the Board's ability to exercise its own independent judgment and requires it to render a decision proposed by only one of the parties. The majority's decision today means that the Board could be faced with two extreme and undesirable outcomes with no choice but to select one. Without the discretion to ensure that rates prescribed in FORR cases are reasonable, FORR could operate to depress rail rates below what is needed for carriers to invest in, maintain, or even improve the rail network.

---

[3] I also believe that the Board and stakeholders are underestimating the demand that multiple FORR cases will place on the Board's docket. The FORR Final Rule sets out that the Board will issue decisions 90 days after the receipt of replies—I question whether that goal will be achievable if the Board faces even a few FORR cases at the same time, and I am concerned that FORR cases may easily overwhelm the Board's ability to deliberate on other matters in a timely manner.

Appellate Case: 22-3648    Page: 45    Date Filed: 12/27/2022 Entry ID: 5230620

**Appendix A**

**Code of Federal Regulations**

For the reasons set forth in the preamble, the Surface Transportation Board amends parts 1002, 1111, 1114, and 1115 of title 49, chapter X, of the Code of Federal Regulations as follows:

**PART 1002—FEES**

1. The authority citation for part 1002 continues to read as follows:

**Authority:** 5 U.S.C. 552(a)(4)(A), (a)(6)(B), and 553; 31 U.S.C. 9701; and 49 U.S.C. 1321. Section 1002.1(f)(11) is also issued under 5 U.S.C. 5514 and 31 U.S.C. 3717.

2. Amend § 1002.2 by revising paragraph (f)(56) to read as follows:

**§ 1002.2 Filing fees.**

\*   \*   \*   \*   \*

(f) \* \* \*

| Type of Proceeding | Fee |
|---|---|
| \*   \*   \*   \*   \*   \* | |
| **PART V:  Formal Proceedings:** | |
| (56)    A formal complaint alleging unlawful rates or practices of carriers: | |
| (i) A formal complaint filed under the coal rate guidelines (Stand-Alone Cost Methodology) alleging unlawful rates and/or practices of rail carriers under 49 U.S.C. 10704(c)(1) | $350. |
| (ii) A formal complaint involving rail maximum rates filed under the Simplified-SAC methodology | $350. |
| (iii) A formal complaint involving rail maximum rates filed under the Three Benchmark methodology | $150. |
| (iv) A formal complaint involving rail maximum rates filed under the Final Offer Rate Review procedure | $150. |
| (v) All other formal complaints (except competitive access complaints) | $350. |
| (vi) Competitive access complaints | $150. |
| (vii) A request for an order compelling a rail carrier to establish a common carrier rate | $350. |

\*   \*   \*   \*   \*

Appellate Case: 22-3648     Page: 46     Date Filed: 12/27/2022 Entry ID: 5230620

**PART 1111—COMPLAINT AND INVESTIGATION PROCEDURES**

3. The authority citation for part 1111 is revised to read as follows:

**Authority:** 49 U.S.C. 10701, 10704, 11701, and 1321

4. Amend § 1111.3 by revising paragraph (c) to read as follows:

**§ 1111.3 Amended and supplemental complaints.**

\*   \*   \*   \*   \*

(c) *Simplified standards*. A complaint filed under Simplified-SAC or Three-Benchmark may be amended once before the filing of opening evidence to opt for a different rate reasonableness methodology, among Three-Benchmark, Simplified-SAC, or stand-alone cost. If so amended, the procedural schedule begins again under the new methodology as set forth at §§ 1111.9 and 1111.10. However, only one mediation period per complaint shall be required. A complaint filed under Final Offer Rate Review may not be amended to opt for Three-Benchmark, Simplified-SAC, or stand-alone cost, and a complaint filed under Three-Benchmark, Simplified-SAC, or stand-alone cost may not be amended to opt for Final Offer Rate Review.

5. Amend § 1111.5 by revising paragraphs (a), (b), (c), and (e) to read as follows:

**§ 1111.5 Answers and cross complaints.**

(a) *Generally*. Other than in cases under Final Offer Rate Review, which does not require the filing of an answer, an answer shall be filed within the time provided in paragraph (c) of this section. An answer should be responsive to the complaint and should fully advise the Board and the parties of the nature of the defense. In answering a complaint challenging the reasonableness of a rail rate, the defendant should indicate whether it will contend that the Board is deprived of jurisdiction to hear the complaint because the revenue-variable cost percentage generated by the traffic is less than 180 percent, or the traffic is subject to effective product or geographic competition. In response to a complaint filed under Simplified-SAC or Three-Benchmark, the answer must include the defendant's preliminary estimate of the variable cost of each challenged movement calculated using the unadjusted figures produced by the URCS Phase III program.

(b) *Disclosure with Simplified-SAC or Three-Benchmark answer.* The defendant must provide to the complainant all documents that it relied upon to determine the inputs used in the URCS Phase III program.

(c) *Time for filing; copies; service*. Other than in cases under Final Offer Rate Review, which does not require the filing of an answer, an answer must be filed with the Board within 20 days after the service of the complaint or within such additional time as the Board may provide. The defendant must serve copies of the answer upon the complainant and any other defendants.

\*   \*   \*   \*   \*

(e) *Failure to answer complaint*. Other than in cases under Final Offer Rate Review, which does not require the filing of an answer, averments in a complaint are admitted when not denied in an answer to the complaint.

\*   \*   \*   \*   \*

6.  Amend § 1111.10 by adding paragraph (a)(3) to read as follows:

## § 1111.10 Procedural schedule in cases using simplified standards.

(a) \*   \*   \*

(3)(i) In cases relying upon the Final Offer Rate Review procedure where the complainant elects streamlined market dominance:

(A) Day -25—Complainant files notice of intent to initiate case and serves notice on defendant.

(B) Day 0—Complaint filed; discovery begins.

(C) Day 35—Discovery closes.

(D) Day 49—Complainant's opening (rate reasonableness analysis, final offer, and opening evidence on market dominance). Defendant's opening (rate reasonableness analysis and final offer).

(E) Day 59—Parties' replies. Defendant's reply evidence on market dominance.

(F) Day 66—Complainant's letter informing the Board whether it elects an evidentiary hearing on market dominance.

(G) Day 73—Telephonic evidentiary hearing before an administrative law judge, as described in §1111.12(d) of this chapter, at the discretion of the complainant (market dominance).

(H) Day 149—Board decision.

(ii) In cases relying upon the Final Offer Rate Review procedure where the complainant elects non-streamlined market dominance:

(A) Day -25—Complainant files notice of intent to initiate case and serves notice on defendant.

(B) Day 0—Complaint filed; discovery begins.

Appellate Case: 22-3648     Page: 48     Date Filed: 12/27/2022 Entry ID: 5230620

(C) Day 35—Discovery closes.

(D) Day 49—Complainant's opening (rate reasonableness analysis, final offer, and opening evidence on market dominance). Defendant's opening (rate reasonableness analysis and final offer).

(E) Day 79—Parties' replies. Defendant's reply evidence on market dominance.

(F) Day 169—Board decision.

(iii) In addition, the Board will appoint a liaison within five business days after the Board receives the pre-filing notification.

(iv) The mediation period in Final Offer Rate Review cases is 20 days beginning on the date of appointment of the mediator(s). The Board will appoint a mediator or mediators as soon as possible after the filing of the notice of intent to initiate a case.

(v) With its final offer, each party must submit an explanation of the methodology it used. If a complainant fails to submit explanation and support for its offer, the Board may dismiss the complaint without determining the reasonableness of the challenged rate.

\*     \*     \*     \*     \*

7. Amend § 1111.11 by revising paragraph (b) to read as follows:

### § 1111.11 Meeting to discuss procedural matters.

\*     \*     \*     \*     \*

(b) *Stand-alone cost or simplified standards complaints.* In complaints challenging the reasonableness of a rail rate based on stand-alone cost or the simplified standards, the parties shall meet or otherwise discuss discovery and procedural matters within 7 days after the complaint is filed in stand-alone cost cases, 3 days after the complaint is filed in Final Offer Rate Review cases, and 7 days after the mediation period ends in Simplified-SAC or Three-Benchmark cases. The parties should inform the Board as soon as possible thereafter whether there are unresolved disputes that require Board intervention and, if so, the nature of such disputes.

8. Amend § 1111.12 by revising paragraphs (c), (d)(1), and (d)(2) read as follows:

### § 1111.12 Streamlined market dominance.

\*     \*     \*     \*     \*

(c) A defendant's reply evidence under the streamlined market dominance approach may address the factors in paragraph (a) of this section and any other issues relevant to market dominance. A complainant may elect to submit rebuttal evidence on market dominance issues except in cases under Final Offer Rate Review, which does not provide for rebuttal. Reply and

rebuttal filings under the streamlined market dominance approach are each limited to 50 pages, inclusive of exhibits and verified statements.

(d)(1) Pursuant to the authority under § 1011.6 of this chapter, an administrative law judge will hold a telephonic evidentiary hearing on the market dominance issues at the discretion of the complainant in lieu of the submission of a written rebuttal on market dominance issues. In cases under Final Offer Rate Review, which does not provide for rebuttal, the telephonic evidentiary hearing is at the discretion of the complainant.

(2) The hearing will be held on or about the date that the complainant's rebuttal evidence on rate reasonableness is due, except in cases under Final Offer Rate Review, where the hearing will be held 14 days after replies are due unless the parties agree on an earlier date. The complainant shall inform the Board by letter submitted in the docket, no later than 10 days after defendant's reply is due, whether it elects an evidentiary hearing in lieu of the submission of a written rebuttal on market dominance issues. In cases under Final Offer Rate Review, the complainant shall inform the Board by letter submitted in the docket, no later than 7 days after defendant's reply is due, whether it elects an evidentiary hearing on market dominance issues.

\*   \*   \*   \*   \*

## PART 1114—EVIDENCE; DISCOVERY

9. The authority citation for part 1114 continues to read as follows:

**Authority:** 5 U.S.C. 559; 49 U.S.C. 1321.

10. Amend § 1114.21 by adding paragraph (a)(4) to read as follows:

## § 1114.21 Applicability; general provisions.

(a) \* \* \*

(4) Except as stated in § 1114.31(a)(2)(iii), time periods specified in this subpart do not apply in cases under Final Offer Rate Review. Instead, parties in cases under Final Offer Rate Review should serve requests, answers to requests, objections, and other discovery-related communications within a reasonable time given the length of the discovery period.

\*   \*   \*   \*   \*

11. Amend § 1114.24 by revising paragraph (h) to read as follows:

## § 1114.24 Depositions; procedures.

\*   \*   \*   \*   \*

(h) *Return.* The officer shall either submit the deposition and all exhibits by e-filing (provided the filing complies with § 1104.1(e) of this chapter) or securely seal the deposition and all exhibits in an envelope endorsed with sufficient information to identify the proceeding and

marked "Deposition of (here insert name of witness)" and personally deliver or promptly send it by registered mail to the Office of Proceedings.  A deposition to be offered in evidence must reach the Board not later than 5 days before the date it is to be so offered.

\*　　\*　　\*　　\*　　\*

12.  Amend § 1114.31 by revising paragraphs (a) and (d) to read as follows:

## § 1114.31 Failure to respond to discovery.

(a) *Failure to answer*. If a deponent fails to answer or gives an evasive answer or incomplete answer to a question propounded under § 1114.24(a), or a party fails to answer or gives evasive or incomplete answers to written interrogatories served pursuant to § 1114.26(a), the party seeking discovery may apply for an order compelling an answer by motion filed with the Board and served on all parties and deponents.  Such motion to compel an answer must be filed with the Board and served on all parties and deponents.  Except as set forth in paragraph (a)(2)(iii) of this section, such motion to compel an answer must be filed with the Board within 10 days after the failure to obtain a responsive answer upon deposition, or within 10 days after expiration of the period allowed for submission of answers to interrogatories.  On matters relating to a deposition on oral examination, the proponent of the question may complete or adjourn the examination before he applies for an order.

(1) *Reply to motion to compel generally*. Except in rate cases to be considered under the stand-alone cost methodology or simplified standards, the time for filing a reply to a motion to compel is governed by 49 CFR 1104.13.

(2) *Motions to compel in stand-alone cost and simplified standards rate cases*. (i) Motions to compel in stand-alone cost and simplified standards rate cases must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to answer discovery to obtain it without Board intervention.

(ii) In a rate case to be considered under the stand-alone cost, Simplified-SAC, or Three-Benchmark methodologies, a reply to a motion to compel must be filed with the Board within 10 days of when the motion to compel is filed.

(iii) In a rate case under Final Offer Rate Review, each party may file one motion to compel that aggregates all discovery disputes with the other party.  Each party's motion to compel, if any, shall be filed on the 10th day before the close of discovery (or, if not a business day, the last business day immediately before the 10th day).  The procedural schedule will be tolled while motions to compel are pending.  Replies to motions to compel in Final Offer Rate Review cases must be filed with the Board within 7 days of when the motion to compel is filed.  Upon issuance of a decision on motions to compel, the procedural schedule resumes, and any party ordered to respond to discovery must do so within the remaining 10 days in the discovery period.

(3) *Conference with parties on motion to compel*. Within 5 business days after the filing of a reply to a motion to compel in a rate case to be considered under the stand-alone cost methodology, Simplified-SAC, or Three-Benchmark, Board staff may convene a conference

47

with the parties to discuss the dispute, attempt to narrow the issues, and gather any further information needed to render a ruling.

(4) *Ruling on motion to compel in stand-alone cost, Simplified-SAC, and Three-Benchmark rate cases*. Within 5 business days after a conference with the parties convened pursuant to paragraph (a)(3) of this section, the Director of the Office of Proceedings will issue a summary ruling on the motion to compel discovery.  If no conference is convened, the Director of the Office of Proceedings will issue this summary ruling within 10 days after the filing of the reply to the motion to compel.  Appeals of a Director's ruling will proceed under 49 CFR 1115.9, and the Board will attempt to rule on such appeals within 20 days after the filing of the reply to the appeal.

\*   \*   \*   \*   \*

(d) *Failure of party to attend or serve answers*. If a party or a person or an officer, director, managing agent, or employee of a party or person willfully fails to appear before the officer who is to take his deposition, after being served with a proper notice, or fails to serve answers to interrogatories submitted under § 1114.26, after proper service of such interrogatories, the Board on motion and notice may strike out all or any part of any pleading of that party or person, or dismiss the proceeding or any part thereof.  Such a motion may not be filed in a case under Final Offer Rate Review.  In lieu of any such order or in addition thereto, the Board shall require the party failing to act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the Board finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

\*   \*   \*   \*   \*

## PART 1115—APPELLATE PROCEDURES

13.  The authority citation for part 1115 continues to read as follows:

**Authority:** 5 U.S.C. 559; 49 U.S.C. 1321; 49 U.S.C. 11708.

14.  Amend § 1115.3 by revising paragraph (e) to read as follows:

### § 1115.3 Board actions other than initial decisions.

\*   \*   \*   \*   \*

(e) Petitions must be filed within 20 days after the service of the action or within any further period (not to exceed 20 days) as the Board may authorize.  However, in cases under Final Offer Rate Review, petitions must be filed within 5 days after the service of the action, and replies to petitions must be filed within 10 days after the service of the action.

\*   \*   \*   \*   \*